**UNITED STATES of America,
Plaintiff,**

v.

**VITASAFE CORP., Defendant.**

United States District Court
S. D. New York.

Sept. 2, 1964.

See also D.C., 212 F.Supp. 397.

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, Anthony J. D'Auria, Arthur M. Handler, Asst. U. S. Attys., of counsel, for plaintiff.

Frank W. Whiting, Washington, D. C., for the Federal Trade Commission.

Bass & Friend, New York City, Milton A. Bass, Robert Ullman, New York City, of counsel, for defendant.

WEINFELD, District Judge.

This action was instituted against the defendant, a nationwide distributor of vitamins, to recover civil penalties and

to enjoin continued violations of a cease and desist order issued by the Federal Trade Commission.[1]

 The proceeding before the Commission charged a violation of the Federal Trade Commission Act by advertising in newspapers, magazines and other national media an allegedly deceptive "thirty day free trial" offer as an inducement to the public to purchase "Vitasafe C. F. Capsules." The charge also included allegations that the defendant was guilty of unfair trade practices with respect to the cancellation of orders and demands for payment of cancelled orders. The defendant, without admitting any of the alleged violations, entered into an agreement as a result of which a cease and desist order issued[2] which, insofar as here pertinent, provided that the defendant was forthwith to desist from:

\* \* \* \* \* \*

"(3) Shipping additional merchandise and attempting to collect the price thereof, when the right of refusing such merchandise has been granted after the required notification of refusal has been given to respondent;

"(4) Refusing to cancel orders for undelivered merchandise when the right of cancellation exists and the required notice of cancellation has been given to respondent."

Ten separate violations of either Paragraphs 3 or 4 of the aforesaid order, each the basis of a separate claim, are charged; all are contested by the defendant. In nine of the claims depositions were taken of witnesses in various parts of the country and, in the tenth the purchaser testified upon the trial. Following the transcription of the record, at the request of counsel extensive oral argument was heard on each separate claim. Thereafter the Court again reviewed the entire trial record, and, based thereon and on its observation of those witnesses who appeared upon the trial, is persuaded that the Government has sustained its burden of proof in nine of the claims.

A clear pattern emerges of high-pressure methods of operation which resulted in violation of the terms of the cease and desist order. After customers received the thirty-day trial supply, automatic follow-up shipments were made prior to the expiration of the right of cancellation. In other instances, despite timely cancellation continued shipments were made. Then followed a series of dunning letters demanding payment for properly cancelled shipments, harassing letters from a credit bureau controlled by the defendant, attorney's letters threatening legal action and continuing unjustified demands over an extended period, the defendant desisting only when notified by either the Federal Trade Commission or the Better Business Bureau that customers had filed complaints.

One case may be cited which is substantially typical, although each rests upon its own individual facts. A customer, a radio announcer living in Oklahoma, in response to a magazine advertisement ordered the thirty-day trial supply of defendant's vitamins, mailing the requested payment for handling and mailing. Subsequent to the receipt of the order he received a second thirty-day supply. Within three or four days fol-

---

1. 15 U.S.C. §§ 45(a) (1) and 49 (1958).

2. The defendant did not contest the charges contained in the Commission's complaint. Instead, in accordance with a procedure adopted by the Commission, it entered into an agreement upon which the cease and desist order issued. Having thus avoided a determination on the merits and after agreeing that "the order shall have the same force and effect as if entered after a full hearing," defendant now contends that the order is not "final" as defined in 15 U.S.C. § 45(g), and accordingly that this action may not be maintained.

This cavil, heretofore rejected by Judge Palmieri and reasserted here, is so lacking in substance as to merit no comment. See Dixon, Practice and Procedure Before the Federal Trade Commission, 9 N.Y.L.F. 31, 49 (1963), for an outline of the procedure.

lowing receipt of the latter shipment he gave the defendant the required cancellation notice. It was timely and should have terminated all future shipments. Instead, the defendant sent three successive monthly shipments together with invoices. On receipt of the fifth shipment, the customer wrote a second letter and later returned the four post-trial shipments. The defendant, notwithstanding the two cancellation notices and the return of the product, made persistent efforts to collect payment, threatened suit and continued the attempts at collection until it received a copy of a letter the customer had written to the Better Business Bureau.

The defendant's position that such additional shipments as were sent despite proper cancellations and the persistent demands for payment made thereafter were due to the size of its operations, clerical error or malfunctioning of its electronic equipment, is neither persuasive nor supported by the record. But more important, a machine cannot be used to excuse non-compliance with the terms of the cease and desist order. Defendant's procedures and equipment could readily have been adjusted to avoid the situation here presented. Indeed, the defendant in its compliance proposal indicated that its suggested procedure "should make it impossible for any additional shipments to reach the customer through clerical error." But the fact is that the defendant, to serve its own economic interest, bunched orders and geared the timing of the additional shipments without regard to initial or subsequent cancellation periods and in disregard of the customers' right to discontinue.[3]

3. A number of the consumer complaints reflected in this record would have been avoided had the defendant refrained from initiating shipment of the first to-be-paid-for vitamins until expiration of the cancellation period.

4. Defendant's failure to keep accurate records assumes some significance since its actions with respect to the asserted claims occurred not too long after the Commission filed its order, in light of

The defendant's methods are perhaps exemplified by the absence of crucial records and the inadequacy of such records as were produced.[4] In six of the ten claims the defendant was unable to produce a single record. The limited records it did produce in the instance of the other claims revealed striking inaccuracies on material matters. Indeed, in one instance defendant's "fulfillment manager" acknowledged that a letter to a customer who had complained about its failure to honor a cancellation—incidentally a letter allegedly based upon defendant's records—had contained unexplained discrepancies and had omitted two payments for which the customer was entitled to credit.

With so much depending upon the date the defendant received a customer's request for a trial supply, it is singular that the defendant, with all its electronic equipment did not record the day it received the request. In the light of continued shipments despite timely cancellation, repeated with regularity and occurring throughout the country, it is difficult to accept the defendant's contention that these were the result of clerical error or electronic malfunction.

The Court makes the following findings of fact:

CLAIM NO. 1 (Mrs. R. K. Strong)

1. Mrs. R. K. Strong, of Butte, Montana, accepted defendant's thirty-day trial offer which appeared in Coronet Magazine, with the right to cancel future shipments at the end of three weeks.

2. Approximately two weeks after her receipt of the trial supply, and before the expiration of her right to cancel, the defendant sent an additional shipment

which the defendant must have been aware of the importance of full and accurate records. As was said in an analogous context: "Such seemingly careless concern for records at a time when they were being requested by the revenue agents would clearly support the inference that the information contained therein would be harmful to the defendants." Yoffe v. United States, 153 F.2d 570, 574 (1st Cir. 1946).

which Mrs. Strong, within two or three days of its receipt, delivered to the post office for return to the defendant. She also sent defendant a form postcard which came with the second shipment, as well as a letter indicating that she did not desire additional shipments. These were sent prior to the expiration of the three week cancellation period referred to in the advertisement.

3. Notwithstanding this timely cancellation the defendant sent ten dunning letters, two collection agency letters and, in addition, an attorney at defendant's direction also made a demand upon her for payment.

4. Mrs. Strong complained to the Federal Trade Commission, after which she heard nothing further from the defendant.

### CLAIM NO. 2 (C. Allan Ingals, Jr.)

5. C. Allan Ingals, Jr., of Park Forest, Illinois, accepted for his wife and himself the defendant's offer, which appeared either in the magazine Coronet or Reader's Digest, of a thirty-day supply of vitamins with the right to cancel future monthly shipments.

6. Ingals received the first samples in April, 1958; within three weeks thereafter he received the second shipment of two bottles of vitamins, one for himself and one for his wife, together with a bill for $5.73.

7. Approximately one week after the receipt of the second shipment, Ingals properly exercised his right of cancellation; nevertheless he received a third shipment three weeks after the second.

8. Ingals then wrote a second letter to the defendant calling attention to his previous cancellation. Despite the two notes of cancellation, Ingals received a fourth shipment. He was billed for the third and fourth shipments, which had been timely and properly cancelled, as well as for the second, upon which a payment of $5.73 was due.

9. The defendant thereafter from time to time demanded payment for all shipments, including the third and fourth. In addition, on two separate occasions an attorney representing the defendant sent Ingals letters threatening legal action. The attorney's letters enclosed statements for all three shipments, including the two which had been properly cancelled. After receipt of the attorney's second letter Ingals informed the Better Business Bureau of the situation and of his readiness to pay for the shipment received prior to cancellation. Defendant then advised Ingals that upon payment for the one shipment the matter would be closed.

### CLAIM NO. 3 (Lawrence B. Slater)

10. Lawrence B. Slater of Washington, D. C., deceased at the time of the Federal Trade Commission's investigation, accepted defendant's trial offer and received a thirty-day supply.

11. Subsequent to the trial supply Slater received additional shipments, although with respect to at least one such shipment he had given proper and timely notice of cancellation.

12. The defendant admits that it received a notice of cancellation on June 18, 1958, but contends it had shipped a supply on June 15th. This claim of prior shipment is based upon defendant's own declaration made in response to a complaint Slater submitted to the Federal Trade Commission. However, the Court is not bound to accept the defendant's self-serving statement that it received the cancellation three days after shipment, particularly in view of the fact that defendant failed to produce not only the original letter of cancellation, but, more important, the file card of the Slater account which, according to defendant's "fulfillment manager," should at once have indicated the date of receipt of the cancellation, as well as the date of payment for the May shipment when, Mrs. Slater testified, the cancellation had been sent. This Court is of the view that the defendant's admission of receipt of Slater's cancellation notice was compelled by reason of the existence of documentary proof which it knew was

in the possession of the Federal Trade Commission.[5]

13. After Slater had given proper and timely notice of cancellation the defendant shipped at least one month's supply, attempted to collect therefor and refrained from further attempts to collect for the properly cancelled shipment only after it was advised by Slater that he had communicated with the Federal Trade Commission.

### CLAIM NO. 4 (Christa Niehaus)

14. Mrs. Christa Niehaus accepted the defendant's offer of a thirty-day trial supply of Vitasafe vitamin capsules, with the right of cancellation as set forth in the defendant's advertisement in the Cleveland Press. She received the vitamins in April, 1958, and an additional shipment in May when she also requested a thirty-day supply for her husband which was delivered. Further supplies were shipped under both orders through July, 1958; Mrs. Niehaus paid for these.

15. In July, 1958, Mrs. Niehaus wrote to the defendant cancelling both for her husband and herself. Despite timely and proper cancellation, an additional shipment of two thirty-day supply packages of vitamins was received in August, 1958, for her husband's account. She immediately returned the shipment unopened to the defendant.

16. Upon being billed for the August shipment in September, 1958, Mrs. Niehaus again wrote to the defendant advising of the earlier return of the August shipment and the prior July letter of cancellation. The defendant did not respond, just as it had failed to acknowledge the July letter of cancellation. In December, the defendant again billed Mrs. Niehaus, although no sum was due it, and upon the trial the defendant conceded that it was wrong in dunning for this payment. On receipt of the December bill Mrs. Niehaus communicated with the Better Business Bureau and at its request filled in the form containing her version of the transaction. Thereafter,

in April, 1959, she received a letter from the defendant. This letter, written by an attorney and allegedly based upon records kept by the defendant, contains a series of substantial and material inaccuracies as to dates of receipt and deposit of payments and the amounts paid. The defendant's "fulfillment manager" acknowledged that the letter contained "disparities" which he could not explain and omitted two payments for which the customer was entitled to credit.

### CLAIM NO. 5 (Marguerite M. Sheridan)

17. Mrs. Marguerite M. Sheridan, then of Inglewood, California, accepted for herself and her husband the defendant's offer of a month's trial supply of Vitasafe Capsules, with the right of cancellation as set forth in defendant's advertisement which appeared in the Los Angeles Times or the Los Angeles Examiner. She received the month's supply sometime in September, 1958, and after taking the vitamins for one week and well within the cancellation period, returned a form postcard cancelling future shipments.

18. Despite the cancellation, and within ten days of it, Mrs. Sheridan received two bottles of vitamins together with a bill therefor—this second shipment arriving about two and one-half weeks after the trial supply.

19. Notwithstanding the timely and proper cancellation, the defendant periodically billed and dunned Mrs. Sheridan, threatening legal action to recover payment.

20. The efforts of the defendant to collect payment for the cancelled shipment extended over a period of about four months and ceased only after Mrs. Sheridan had complained to the Better Business Bureau. The defendant advised her that it had been contacted by that organization and informed her that if she would return the additional shipment, which she had retained unopened, the matter would be dropped. She complied

---

5. Defendant's letter of August 8, 1958, Exh. 24.

with the request, although she was under no obligation to do so.

### CLAIM NO. 6 (James T. Sewell)

21. James T. Sewell, of Atlanta, Georgia, in or about January, 1959, accepted for his wife and himself defendant's thirty-day trial offer as set forth in an advertisement in the Atlanta Journal. Sewell received the two trial shipments separately. The evidence as to the date of receipt of the respective shipments; the date of cancellation; whether cancellations were effected at the same time or on separate occasions; and when, if at all, additional shipments were made, is somewhat contradictory. The evidence in support of this claim is not sufficient to permit a finding that the Government has sustained its burden of proof, and, accordingly, the defendant is entitled to judgment on this claim.

### CLAIM NO. 7 (Mrs. R. J. Hiler)

22. Mrs. R. J. Hiler, then of Decatur, Georgia, in January, 1959, accepted the defendant's thirty-day trial offer as set forth in its advertisement. After receipt of the trial supply and before the first additional shipment, Mrs. Hiler also ordered vitamins for her husband.

23. At the end of February, 1959, she received a bottle of each formula, together with a bill which she paid.

24. At the end of April she received a shipment which contained only one bottle of vitamins but was billed for two. About a week thereafter she mailed a check for the one bottle, directed defendant's attention to the error in billing and, at the same time, gave notice of cancellation. This notice was timely and properly given with respect to future shipments. Nonetheless, at the end of May, about three weeks after the cancellation, Mrs. Hiler received an additional shipment of two bottles of vitamins which she immediately returned to the defendant unopened, and wrote stating that she had previously given notice of cancellation.

25. In June she received a bill for the returned shipment and again notified the defendant of her previous cancellation. In July she received still another bill and wrote once again. None of these communications was acknowledged by the defendant which, however, over a four-month period threatened legal action to collect payment for the additional shipment. The defendant finally acknowledged a registered letter sent at the end of August.

26. When defendant persisted in attempts to collect for the cancelled shipment, Mrs. Hiler communicated with the Better Business Bureau. Thereafter defendant advised her of receipt of a letter from that organization and that it had closed her account as credited in full. The defendant does not challenge the facts as testified to by Mrs. Hiler, and indeed its "fulfillment manager" acknowledged that "this account was improperly handled," attributing this situation to clerical fault. Clerical error might account for failure to answer a single letter, but here the customer wrote four letters of cancellation, received no reply until she registered one and was dunned for payment until she complained to the Better Business Bureau.

### CLAIM NO. 8 (Ann McManus)

27. Mrs. Ann McManus of Bronx, New York, in July, 1959, accepted defendant's thirty-day trial offer which appeared in the American Legion Magazine, with the right to cancel future shipments.

28. Approximately a week after Mrs. McManus received the trial shipment, and on or about August 17th, she received a second shipment, together with an invoice. On August 28th she sent a registered letter to the defendant enclosing a check in payment of the invoice and properly notified the defendant to cancel future shipments. In response to this registered letter of cancellation the defendant sent Mrs. McManus a form letter dated August 31st stating that she had not given an account number. In fact her letter had contained an account number correctly transcribed except for the first digit which was not clearly

legible on defendant's invoice and which on casual observation appears as Mrs. McManus read it. Mrs. McManus also gave her correct name and address as shown on the defendant's invoice.

29. The defendant took no steps to identify Mrs. McManus' account, which was readily identifiable on defendant's alphabetical file or by diligent effort also could have been identified through the account number shown in her letter of August 28th.

30. Upon receipt of the defendant's form letter, Mrs. McManus communicated with the Better Business Bureau.

31. Approximately three weeks after the defendant received the registered cancellation it sent another shipment which Mrs. McManus delivered to the post office for return to the defendant. Included in the shipment was an invoice.

32. On September 24th, after receiving a communication from the Better Business Bureau, defendant wrote to Mrs. McManus an explanatory letter which contained misstatements with respect to the notice of cancellation and payment. Defendant, however, indicated that the account was closed.

### CLAIM NO. 9 (Charles S. Garant)

33. Charles S. Garant, then of Woodward, Oklahoma, in late 1959 or early 1960 accepted the defendant's offer of a thirty-day trial supply of Vitasafe Capsules as described in a magazine advertisement, with the right of cancellation of future shipments.

34. Shortly he received the trial supply and about a month later the first additional shipment, together with an invoice which he did not pay. Within three or four days after this shipment Garant gave the defendant timely and proper notice of cancellation. Notwithstanding the cancellation, the defendant sent three successive monthly shipments, together with invoices.

35. Upon receipt of the fifth shipment Garant wrote a second letter reminding defendant of his earlier cancellation and thereafter returned all four post-trial shipments, the three that Garant had received after cancellation, as well as one received prior thereto, which he had retained unopened.

36. The defendant, despite the return of the three properly cancelled shipments, continued for five months to demand payment, desisting from further dunning and collection efforts only when Garant sent defendant's credit agency a copy of a letter that he had written to the Federal Trade Commission.

### CLAIM NO. 10 (Miss Eleanor Fackler)

37. Miss Eleanor Fackler of Chicago, Illinois, accepted defendant's offer of a thirty-day trial offer which appeared in a magazine, with a right to cancel future shipments.

38. She received the trial supply about the middle of May, 1960. About June 13, 1960, she received an invoiced shipment which she promptly returned to the defendant, at the same time properly cancelling future shipments.

39. Notwithstanding her proper cancellation, defendant forwarded another supply about the middle of July, which Miss Fackler returned to the post office unopened. Thereafter defendant requested payment for the properly cancelled item, as well as for the shipment made in June.

40. Miss Fackler communicated with the Federal Trade Commission and later the defendant, for the first time, acknowledged her earlier cancellation but demanded payment for both June and July shipments.

### CONCLUSIONS OF LAW

■ (1) In the instance of all the foregoing claims, except No. 6, the acts and conduct of the defendant violated Paragraphs 3 and 4 of the order of the Federal Trade Commission.

■ (2) In totality, there were such widespread violations of the terms of the

Commission's order and a lack of purpose to prevent them as to warrant an injunction against future violations.[6]

Submit decree in accordance with the foregoing within ten days and the Court will fix therein the amount of penalty to be imposed with respect to each claim. Counsel for the respective parties may, upon settlement of the decree, submit any relevant information or data on this subject.

6. Cf. Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944).