**UNITED STATES of America,
Plaintiff,**

v.

**William N. BOSTIC, Defendant.**

**Civ. A. No. 70–1135.**

United States District Court,
D. South Carolina,
Columbia Division.

Dec. 21, 1971.

As Amended Jan. 6, 1972.

John K. Grisso, U. S. Atty., Columbia, S. C., Kathryn Casey, F.T.C., Robert E. Duncan, Office of Gen. Counsel, F.T.C., Washington, D. C., for plaintiff.

W. Ray Berry, Columbia, S. C., Joseph J. Lyman, Washington, D. C., for defendant.

## ORDER

CHAPMAN, District Judge.

On January 7, 1965, the Federal Trade Commission issued its Cease and Desist Order in Docket No. 8634, which Order was based on a consent agreement by the defendant, William N. Bostic, and directed that he and certain corporations controlled by him cease engaging in certain unfair and deceptive acts and practices in violation of Section 5(a) (1) of the Federal Trade Commission Act (15 U.S.C. Section 45(a) (1)). The Order became final by operation of law on March 8, 1965, and was in effect at all times mentioned in the complaint and referred to by witnesses in this proceeding.

The January 7, 1965, Order provided as follows:

"It is ordered that the respondents Aluminum Industries, Inc., a corporation, and its officers, and William N. Bostic, individually and as an officer of said corporation, and doing business as Southern Patio Company, Southern Aluminum Sales, and under any other trade name, and respondents' agents, representatives and employees, directly or through any corporate or other device, in connection with the offering for sale, sale or distribution of aluminum carports, aluminum patio covers, aluminum siding, or any other products in commerce, as 'commerce' is defined in the Federal Trade Commission Act, do forthwith cease and desist from:

1. Using, in any manner, any advertising, sales plan, scheme or device wherein false, misleading or deceptive statements or representations are made in order to obtain leads or prospects for the sale of products or services.

2. Discouraging the purchase of, or disparaging, any products or services which are advertised or offered for sale.

3. Representing directly or by implication, that any products or services are offered for sale when such offer is not a bona fide offer to sell such products or services."

The complaint contained twenty separate counts of alleged violations of the Order. Defendant's answer contained a general denial and also alleged that the complaint did not state facts sufficient upon which relief could be granted. At various times during the proceedings the defendant contended that the Order was too vague, general and all inclusive to be enforceable and that it was in violation of the constitutional guarantee of due process because of this overbreadth and vagueness. Defendant also contended that the Federal Trade Commission had not complied with its own rules and regulations in certifying the facts to the Attorney General and in failing to advise the defendant that he was not in compliance with the Order and discussed such non-compliance with him and given

defendant an opportunity to submit his views respecting the alleged violations.

The Court finds that these allegations of defendant are without merit. The letter of Casper W. Weinberger, Chairman of the Federal Trade Commission, addressed to the Attorney General of the United States under date of June 15, 1970, certifies the facts of the violations by the defendant and requests the institution of appropriate proceedings for recovery of civil penalties and for a permanent injunction. The testimony of George Zervas and Joel Thwaites, together with the correspondence between the Federal Trade Commission and the defendant and his attorney certainly indicate that the defendant was advised that he was not in compliance with the order and was given ample opportunity to determine the specifics of the allegations of non-compliance and to bring himself within the provisions of the Order, if he had really desired to do so.

■ At one point the defendant contended that the sale of swimming pools was not covered by the terms of the Order. However, it is obvious from the wording of the Order that it is intended to cover all products sold by the defendant at the time of the execution of such Order, and in the future, and covers any product in commerce. The actual thrust of the Order is directed against a deceitful and unlawful sales technique and therefore covers any product the defendant or his representatives might sell using the "bait and switch" sales approach.

■ The Government carried its burden of proof overwhelmingly on each count and is entitled to recover penalties thereon. The defendant has deliberately flouted the provisions of the Cease and Desist Order. His callous disregard of the Order, which approaches contempt, and his efforts to disguise his interstate activities, by setting up a corporation in North Carolina with his sister as a "front", all lead this Court to the conclusion that an injunction should also be issued against the defendant.

The defendant relies upon the Jencks Act, 18 U.S.C. § 3500 to support his motion to strike the depositions of Donald Lee Allen, Mr. and Mrs. Garland Duncan, Roy L. Good, Edward P. Greene and Gwyn Allen Miller. When these depositions were taken in the State of North Carolina in early July 1971, defense counsel requested copies of statements of these individuals, and the request was denied by counsel for the plaintiff on the grounds of privilege and work product of attorneys for the plaintiff. On September 7 depositions were taken of Mrs. Lois Reno Guy and Sergeant and Mrs. Musselwhite and defense counsel demanded copies of statements given by these witnesses. On July 31, 1971, defendant filed a motion under Rule 37(a) of the Federal Rules of Civil Procedure, for an Order compelling the plaintiff to answer certain interrogatories, which demanded copies of all signed and unsigned statements in the possession of the plaintiff. This motion was granted by the Court after a hearing on September 14, 1971. The statements were thereafter furnished to defense counsel on September 22, 1971. The defendant first raised the question of denial of due process under the Jencks Act after the trial had begun on November 22, 1971.

■■ The Jencks Act was legislated to limit the effect of the case of Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, which involved the right of an accused to have for purposes of impeachment a document prepared by a Government witness which formed the basis of the witness' testimony. The principle of the Jencks case has been applied to administrative hearings, and justice requires no less. Section (b) of the Statute reads:

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as

to which the witness has testified. If the entire contents of such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use."

█ The object of this provision is to enable defense counsel to use prior statements of a witness for impeachment purposes. This is inherent in the language and context of the above provision.

█ In the present action the defense counsel made no effort on cross examination of the witnesses to question them regarding their signed statements and never attempted to attack the veracity of the witness. The defendant relies upon the case of Harvey Aluminum v. National Labor Relations Board, 335 F.2d 749 (9th C.A.1964). The Court feels that the cases are not analogous. In *Harvey* the N.L.R.B. charged the company with engaging in an unfair labor practice by employing undercover agents (employees of a detective firm) to maintain surveillance of union activities. The company admitted surveillance but insisted that its object was to prevent pilferage. There was a conflict in testimony of employees of the detective agency as to the nature of their duties and the Court was faced with the question of fact as to which witnesses to believe. In the *Harvey* case the prior statements were sought for the purpose of attacking the credibility of the witnesses. Subpoenas duces tecum, addressed to the Secretary of Labor and the Attorney General were issued but later revoked; and petitioners then sought to have the Board ask the Secretary of Labor and the Attorney General to make the statements available, under 29 U.S.C.A. § 161(6). This request was denied. The present proceeding is unlike Harvey Aluminum, since there is no conflict as to the central issue, there is no conflict in the testimony of the various Government witnesses, and the Government did produce the copies of statements, at the direction of the Court,

and two months before the trial of the case. The present defendant was aware as early as July 7, 1971, that the Government objected to furnishing copies of the witnesses' statements, but did not invoke the Jencks Act until the trial. The defendant also had sixty days after receiving copies of the witnesses' statements to re-examine any witness to determine credibility, but he did nothing. Two witnesses were deposed after the statements were delivered to the defendant, but defense counsel were not present at these depositions. Three witnesses, who had been deposed, were present and gave testimony at the trial, but the defense counsel made no effort to contradict or impeach them with the statements.

No effort was made by the defendant to call as a witness any of the salesmen or agents to testify as to what sales pitch was used or to attempt to contradict the testimony of the various consumers. The defendant stipulated that the depositions of persons not present at the trial would be admissible, knowing full well that he had not cross-examined these witnesses as to prior statements, and knowing that he would not take further depositions based on information he had received from the prior statements. He cannot complain that he has been deprived of due process in light of his own refusal to take any protective steps when he had ample opportunity to do so prior to the trial date.

After considering all the evidence the Court makes the following:

### FINDINGS OF FACT

1. Defendant William N. Bostic is a resident of the State of South Carolina and is charged with violating the provisions of a Cease and Desist Order (entered into and accepted by the defendant), issued by the Federal Trade Commission on January 7, 1965, which directed him to refrain from certain sales practices, more particularly set forth above.

2. Under the language of this Order defendant was prohibited from engaging

in any of the practices enumerated, in connection with the offering for sale, sale or distribution of any product in commerce, and the effect of the Order was not limited to products being sold at the time it was issued, but extended to any and all products which defendant might thereafter sell, offer to sell or distribute in commerce.

3. At all times mentioned in the complaint, the defendant was engaged in the offering for sale, sale and distribution of swimming pools in commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act (15 U.S.C. Section 44).

4. The advertisements, identified in Exhibits D through Q to the complaint, each appeared repeatedly, on various dates, in the publications enumerated in Counts 1 through 8 of the complaint and constituted a sales plan, scheme or device of the type contemplated and prohibited by paragraph 1 of the Federal Trade Commission's Order.

5. This sales plan, commonly referred to as a "bait and switch" operation was used in essentially the following manner;

a. An advertisement was inserted in a newspaper or magazine offering to sell a completely installed swimming pool for a price of under $1,000. In some instances the offer included a "free portable TV", or a ten year warranty, or both; and in some instances the advertisement contained reference to a much higher "regular price". The advertisements contained a post office box number, as well as a telephone number, for prospective purchasers to contact.

b. When the prospect responded (usually by telephone) an appointment was set up and one of defendant's agents and salesmen would go to the prospect's home, stating he was there because of the prospect's response to the advertisement.

c. If the prospect confirmed his interest in the pool, the agent wrote out a contract for the pool described in the advertisement (known as ADV pool), at the price stated in the ad. This contract would be signed by the prospect and the salesman and the prospect would be advised that it was a binding contract from which neither party could withdraw.

d. After obtaining the execution of the contract for the ADV pool and advising the prospect that neither party could withdraw from the contract, the agent, after a brief casual social conversation, would begin to call attention to the various disadvantages of the ADV pool, such as: cost of maintenance on a wooden pool, necessity of periodic painting of the pool, problem with wood rotting on pool, difficulty in emptying all water from the pool. All of this was intended to and did make the prospect quite apprehensive about the desirability of the ADV pool which he had just contracted to buy.

e. The agent would then advise the prospect that the company had a larger pool, which was a new product and not yet in general production or availability for sale. This pool was known as the PRO pool by the defendant and his salesmen, but usually called the Dolphin or some aquatic name in talking with the prospect. The agent would produce a model of the pool from his automobile, which model was complete with walkways, deck patio, landscaping, shrubbery, diving board, ladders and other accessories to improve its appearance. He would call attention to the indestructibility of the pool, the safety features, the superior quality of the lining and the fact that it was "maintenance free" and required no painting.

f. When the prospect raised the question of the price of the PRO pool he was advised that it was normally priced from five to eight thou-

sand dollars, but because the prospect was the first person in his area to whom the pool had been shown, the price would be lowered. At this point a bargaining process usually began and the price was lowered from time to time and usually culminated in a telephone call from the salesman to his "boss" for permission to sell the pool at a very low price. In the bargaining process the free television, poolside furniture, shrubbery and other extras were removed to reduce the price. The price finally agreed upon varied from a low of two thousand dollars to as high as thirty-five hundred dollars. As an additional inducement the prospect was told that he would receive fifty dollars for each person who saw his pool, and then purchased one from the company, if he would allow his pool to be used as a neighborhood demonstrator and would allow a small sign to be erected near the pool.

g. If the prospect purchased the PRO pool, the contract for the ADV pool was mutually cancelled. If the prospect did not purchase the PRO pool, the ADV pool was never delivered.

6. All the purchasers who appeared as witnesses, in person or by deposition, stated that the initial contact with defendant's agent was the direct result of having read one of the advertisements referred to in Finding No. 4, and which defendant through his attorney admitted having been inserted by him in the publications outlined in Counts 1 through 8 of the complaint.

7. About April 1967, Sergeant and Mrs. Leon W. Ohls saw the advertisement in *TV Guide.* The Ohls called the telephone number given in the advertisement and were later contacted by the defendant's agent at their home in Augusta, Georgia. The sales technique was basically as described in Finding No. 5. At one time during the bargaining over the price, a telephone call was made to the defendant and Ohls discussed the matter with him by telephone. Thereafter the PRO pool was purchased, rather than the pool as advertised. Sometime later the defendant Bostic actually called by the home of the Ohls family in Augusta, Georgia, to correct some problem in the operation of the pool. The witness Ohls identified the defendant Bostic in the courtroom as having come by his house on that occasion.

8. Sometime in the Spring of 1967 Mr. and Mrs. Donald L. Allen of Kingsport, Tennessee, answered an ad in *TV Guide,* which showed a swimming pool priced at around $800. They called the telephone number indicated and Raymond W. Fowler, an agent for the defendant, called at their home and went through the sales technique outlined in Finding No. 5, whereby the Allens signed a contract for the ADV pool, but after Fowler made certain observations and disparaging comments about the pool, they purchased the PRO pool for approximately $2,500.

9. In April 1967, Mr. Roy L. Good saw an advertisement by Family Pools, Inc., which showed a swimming pool priced at $895 and called to arrange for one of defendant's agents to come to his home in Hickory, North Carolina. The agent, whose name was Fowler, showed Mr. Good and his wife the ADV pool and after they had signed the contract for the pool he brought out the model for the more expensive PRO pool and generally followed the "bait and switch" approach. The Goods voided the contract on the ADV pool and purchased a PRO pool for approximately $3,300.

10. Sometime prior to April 21, 1967, Sergeant and Mrs. Smitty Musselwhite of Fayetteville, North Carolina, saw an advertisement in *TV Guide,* which showed a swimming pool advertised at approximately $800. They called the local number and one of defendant's agents, by the name of Hayden, called at their home about April 21, 1967. The "bait and switch" sales approach was used and the Musselwhites signed a con-

tract for the ADV pool, after which they were shown the model of the PRO pool and were persuaded to void the ADV contract and sign the contract for a PRO pool.

11. In May 1967, Mrs. Lois Guy saw an advertisement in either the Fayetteville, North Carolina Observer or *TV Guide* which showed a swimming pool priced at around $800. She called the telephone number given and one of the defendant's agents called at her home in Fayetteville, North Carolina. The "bait and switch" sales scheme was used and Mrs. Guy signed a contract for the ADV pool after which she was advised of the cost of maintenance, problems with wood rot and other shortcomings of the pool. She was thereafter persuaded to purchase a PRO pool and void the contract for the ADV pool.

12. In May 1967, Mr. and Mrs. Billy Gene Rushing answered an advertisement in the Winston Salem, North Carolina *Journal-Sentinal*. Thereafter one of defendant's agents called at their home in Winston Salem, North Carolina, at which time Mr. Rushing signed a contract for an ADV pool to be delivered in two weeks and made a deposit of $200. Thereafter the defendant's agent began to disparage the pool and used the "bait and switch" tactic, but Mr. Rushing would not agree to purchase the PRO pool or to cancel the contract on the ADV pool. His ADV pool has never been delivered and his deposit has not been returned.

13. In about June 1967, Mr. James W. Cudworth saw an advertisement in the Greensboro, North Carolina *Record* showing a swimming pool priced at $639. After answering the advertisement defendant's agent called on Mr. Cudworth at his home and an an ADV pool contract was signed for $639.

Thereafter the "bait and switch" scheme was initiated, but Mr. Cudworth insisted on the ADV pool and made a deposit thereon. In spite of repeated attempts to secure delivery of the pool, including a visit to Columbia, South Carolina, Mr. Cudworth never received de-livery of his pool and finally cancelled his order. His deposit was returned after he enlisted the aid of the Columbia Better Business Bureau.

14. Sometime in May 1967 Mr. and Mrs. Edward P. Greene saw an advertisement in *TV Guide* showing a swimming pool priced at approximately $800 to $900. An agent called on them in response to their answer to the ad, and on June 7, 1967, they signed a contract for an ADV pool. Thereafter the agent brought a model of the more elaborate and expensive PRO swimming pool into the home, advising them that it was not yet on the market. The agent pointed out the poor qualities of the ADV pool and generally followed the "bait and switch" scheme outlined in Finding No. 5, resulting in a contract for the PRO pool being signed for $2,495.

15. Sometime prior to July 10, 1967, Mr. Gwyn Allen Miller saw an advertisement for a square swimming pool, and responded to the ad by calling a telephone number in Columbia, South Carolina. Thereafter an agent of defendant called on Mr. Miller at his home in Connelly Springs, North Carolina, and a contract for the ADV pool was signed at a price of approximately $900. The agent then brought in a model of the more elaborate and expensive PRO pool and the usual "bait and switch" scheme was used, resulting in cancellation of the contract for the ADV pool and execution of the contract for the PRO pool.

16. Sometime prior to July 28, 1967, Mr. and Mrs. Frank Powers saw an advertisement in the Greensboro, North Carolina *Record* showing a swimming pool priced at approximately $639. In response to a telephone call one of defendant's agents, Mr. Floyd Sigmon, called at the Powers home in Greensboro, North Carolina. The "bait and switch" tactic was used and the Powers signed a contract for the PRO pool at a price of $2,995.

17. Approximately four months prior to July 1967, Mr. and Mrs. Garland Duncan answered an advertisement in *TV Guide* showing a swimming pool priced

at about $895. On or about July 14, defendant's agent, Mr. Charles Rush, called the Duncan home in Elizabethtown, Tennessee, introduced himself as from Family Pools of Columbia, South Carolina. After the Duncans had signed a contract for the ADV pool the model of the more expensive and elaborate PRO pool was brought into the home. The "bait and switch" sales approach was used and the Duncans cancelled the first contract and signed a contract for the PRO pool at a price of $2,500. Said contract was made out on the form headed "Family Pools, Inc., Post Office Box 5412, Columbia, South Carolina".

18. Sometime prior to August 3, 1967, Mrs. Lois Williams and her daughter, Miss Judy Williams, saw an advertisement in either the Anderson *Independent* or in the *Daily Mail*, both newspapers published in Anderson, South Carolina. Upon answering this advertisement defendant's agent Mr. Raymond Fowler called at the Williams home in Toccoa, Georgia. The usual "bait and switch" game was used and the Williams signed the contract for the ADV pool, thereafter changing to the PRO pool. The contract form used carried the name of Family Pools, Inc. with an address as Post Office Box 5412, Columbia, South Carolina.

19. Sometime in February 1967, Miss Jenny Waters, Manager of Services Unlimited, Winston Salem, North Carolina, (a telephone answering, mobile communications and patrons service organization) received a telephone call from an individual identifying himself as Mr. E. K. Webster of Columbia, South Carolina. Mr. Webster told Miss Waters he wanted to use the facilities of her answering service to handle telephone calls resulting in advertisements inserted by Family Pools, Inc. in *TV Guide*. He instructed Miss Waters to mail any leads or names of prospective customers to him at Family Pools, Inc., P. O. Box 435, Columbia, South Carolina. The name "Webster" was proved to be a code name used by the defendant to identify prospective customers answering advertisements.

20. Sometime prior to March 3, 1967, Mr. Jim Hinshaw, who operates a telephone answering service in Greensboro, Burlington, and Winston Salem, North Carolina, was contacted by an individual, who identified himself as either Mr. E. K. Webster or Mr. Bostic, and made arrangements to have telephone calls resulting from advertisements by Family Pools, Inc. handled by Mr. Hinshaw's organization. Leads or prospective customers names were to be forwarded to Post Office Box 435, Columbia, South Carolina. According to Mr. Hinshaw the advertising referred to generated a great many calls and records of these calls were forwarded as instructed. The service was furnished from March 3 to September 15, 1967.

21. Mrs. Mary Swallows Koucky was employed by defendant as office manager in the office of Family Pools, Inc., Columbia, South Carolina, for a period of approximately eight months from the summer of 1967 until March 1968. Part of her duties involved the placing of swimming pool contracts with various finance companies. If the purchaser's credit rating was not sufficient to place the contract with an independent finance company, it was placed with the Carolina Fund, Columbia, South Carolina, which was operated by the defendant.

Mrs. Koucky testified to sales of pools to purchasers in North Carolina, Georgia and Tennessee. All pool contracts were entered on a record book as they were received, showing the date and the name of the purchaser. A ledger card was made out for each purchaser, and an individual file made up for each sale, arranged alphabetically in a file cabinet.

When Mr. Joel S. Thwaites, Federal Trade Commission Attorney from Atlanta, Georgia, came to the office of Family Pools, Inc. in 1967 to interview the defendant as to his failure to file compliance reports required on the Commission's Order in Docket 8634, the defendant directed that the office door be

locked, and while Mr. Thwaites waited outside, defendant directed that the files on all out of state sales be removed from the file cabinets and hidden, and the names of all out of state purchasers of swimming pools be erased from the record book.

Mrs. Koucky testified that defendant explained to her the "bait and switch" sales method used in the sale of the pools. Mrs. Koucky also stated that during her employment by the defendant, he had in his possession a check book for Family Pools, Inc. of Rockingham, North Carolina, filled with blank checks signed by Mrs. Rushing.

22. About February 1967, defendant William N. Bostic asked his sister, Martha Rushing, and her husband, H. Bryce Rushing of Hoffman, North Carolina, to set up Family Pools, Inc. of Rockingham, North Carolina, as a corporation chartered under the laws of the State of North Carolina, for the purpose of selling swimming pools in North Carolina. Defendant designated Mr. Rushing as President and Mrs. Rushing as Secretary-Treasurer. Mrs. Rushing opened a bank account in the Carolina Bank for the North Carolina corporation, with funds supplied by the defendant, and as directed by the defendant forwarded all mail received by the corporation, as well as all bank statements to Family Pools, Inc. to Columbia, South Carolina. Mr. Rushing performed no duties in connection with his position as President. No organizational meeting was held, no by-laws were prepared, and no minutes of directors or stockholders meetings were available, since such meetings were not held. There were no salesmen employed by the Rushings and they maintained no record or copies of contracts. Mr. and Mrs. Rushing did not attempt to sell swimming pools.

The only checks on the bank account of Family Pools, Inc. of Rockingham, North Carolina, which Mrs. Rushing made up were those covering the incorporation fee and her salary. She sent the book of blank checks, signed by her, to the defendant in Columbia, South

Carolina, and she identified the handwriting on several checks as that of the defendant's wife, Phyllis Bostic. Mrs. Rushing also disavowed the writing of certain letters, which were prepared by the defendant and brought to her for execution only. When Mr. and Mrs. Rushing had an interview with Mr. Joel Thwaites and realized that swimming pools were being sold in other states, and certain questions arose regarding the activities of the corporation, they cancelled the charter of Family Pools, Inc. of Rockingham, North Carolina, and dissolved the corporation on advice of their attorney.

23. The testimony of all the witnesses clearly shows that the defendant continued to follow the same "bait and switch" scheme of selling and pattern of conduct which the Federal Trade Commission had prohibited by its Order of January 7, 1965, and by doing so repeatedly violated said Order.

From the foregoing facts, the Court makes the following

## CONCLUSIONS OF LAW

1. The Federal Trade Commission's Order in Docket 8634, issued January 7, 1965, prohibiting the defendant from using "bait and switch" methods in offering for sale, selling or distributing products in commerce, became effective and enforceable on March 8, 1965, and has been in full force and effect at all times since.

2. The language of said Order is clear and unambiguous, and covers not only those products then being offered for sale, sold or distributed in commerce, but "any other products, which defendant might offer for sale, sell or distribute in commerce, in the future." The Order is not too broad or general. See Niresk Industries, Inc. v. Federal Trade Commission, 278 F.2d 337, 342–343, 7th Cir. 1960, rehearing denied June 8, 1960, in which the Court stated:

"Finally, petitioners contend that the order of the Commission is too broad and should, therefore, be set aside or

modified. The findings of unfair and deceptive practices against the petitioners were confined to their advertising and sale of the cooker-fryer, while the order of the Commission enjoins the use of like advertising by petitioners in conjunction with the sale of the fryer or any other product. Petitioners contend that the order must be restricted to their advertisement and sale of the cooker-fryer alone.

We do not agree with that contention. The Commission has a large discretion in its choice of a remedy which it deems necessary to cope with the unlawful practices found, and courts may interfere with the Commission's choice only if the remedy selected bears no reasonable relationship to such unlawful practices. Federal Trade Commission v. National Lead Co., 352 U.S. 419, 429, 77 S.Ct. 502, 1 L.Ed.2d 438; Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 96 L.Ed. 1081. Commission orders are not designed to punish for past transgressions, but are designed as a means to prevent illegal practices in the future. Federal Trade Commission v. Ruberoid Co., *supra* page 473, 72 S.Ct. 800. To the end that the Commission may achieve that purpose, its orders may prohibit not only the further use of the precise practice found to have existed in the past, but also, future use of related and similar practices. Ibid. Petitioners marketed a large number of products in commerce. They stand adjudged guilty of the use of illegal practices in the advertisement and sale of one product. We think it is entirely reasonable for the Commission to frame its order broadly enough to prohibit petitioners' use of identical legal practices for any purpose, or in conjunction with the sale of any and all products."

3. The evidence is clear that defendant deliberately attempted to evade the prohibitions of the Commission's Order by arranging to set up a corporation in North Carolina, which was controlled and directed by him, in spite of his efforts to conceal such ownership and control.

4. On the twenty occasions mentioned in the Findings of Fact, defendant William N. Bostic has flagrantly and repeatedly violated Paragraphs 1, 2 and 3 of Commission's Order of January 7, 1965.

5. The blatant nature of defendant's disregard for the Order of the Federal Trade Commission warrants the imposition of a sizable penalty and a fine of Four Thousand and No/100 ($4,000.00) Dollars for each violation is hereby imposed making a total fine against the defendant of Eighty Thousand and no/100 ($80,000.00) Dollars.

6. The course of action pursued by the defendant in intentionally violating the provisions of the Commission's Order, and his evident purpose to continue to engage in the same "bait and switch" sales method, has convinced this Court that future violations of the Order can be prevented only by issuance of an injunction under the equitable powers vested in the United States Courts. See United States v. Vitasafe Corporation, 234 F.Supp. 710 (S.D.N.Y.1964) affirmed per curiam 2 Cir., 352 F.2d 62 and Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754.

It is, therefore, ordered that the plaintiff, United States of America, have judgment against the defendant, William N. Bostic, in the amount of Eighty Thousand and No/100 ($80,000.00) Dollars.

It is further ordered that defendant, William N. Bostic, his representatives, agents and employees directly or through any corporate or other device, in connection with the advertising, offering for sale, sale or distribution of any goods in interstate commerce, is hereby permanently enjoined from:

1. Using, in any manner, any advertising, sales plan, scheme or device wherein false, misleading or deceptive statements or misrepresentations are

made in order to obtain leads·or prospects for the sale of products or services.

2. Discouraging the purchase of, or disparaging any product or services which are advertised or offered for sale.

3. Representing, directly or by implication, that any products or services are offered for sale when such offer is not a bona fide offer to sell such products or services.

It is further ordered that the defendant is continually enjoined and required to serve a copy of this Decree on all present and future sales representatives, agents and employees of any corporate or other business enterprise owned, operated or controlled, or which may be in the future owned, operated, controlled or acquired by him and operated by him or at his direction, whether by proxy or by instructions given to members of his immediate family.