UNITED STATES of America,
Plaintiff,

v.

H. M. PRINCE TEXTILES, INC., a corporation, Prince Mills, Inc., a corporation, and Hugo M. Prince, individually and as an officer of said corporations, Defendants.

63 Civ. 1159.

United States District Court
S. D. New York.

March 17, 1966.

Robert M. Morgenthau, U. S. Atty., for plaintiff, David E. Montgomery, New York City, of counsel.

Halperin, Shivitz, Scholer & Steingut, New York City, for defendants, David

I. Shivitz and Shirley R. Levittan, New York City, of counsel.

CANNELLA, District Judge.

Judgment for the Government in the amount of $1000 in civil penalties. Government's requested injunctive relief is denied.

This court has jurisdiction of the action pursuant to 28 U.S.C. § 1345 and § 1355.

This case was tried before this court without a jury on January 17, 1966. It is an action for civil penalties for violation of a Federal Trade Commission (FTC) cease and desist order, 15 U.S.C. § 45(l) and for an injunction against future violations of the order.[1]

On February 10, 1953 the FTC issued a complaint against defendants H. M. Prince Textiles, Inc. and Hugo Prince, among others, charging them with violations of the Wool Products Labeling Act of 1939, 15 U.S.C. § 68 et seq. On August 6, 1953 a consent cease and desist order was issued against the defendants.

In June of 1962, Prince Textiles (hereafter referred to as Prince) entered into negotiations with Toyo Boshi Kogyo Co., Ltd. (hereafter referred to as Toyo Boshi), which it believed to be a reputable firm, for the purchase of 20,000 pounds of yarn, which was to consist of 60% cashmere and 40% wool. Hugo Prince testifed that to the best of his knowledge Prince had dealt with Toyo Boshi on one or two prior occasions. The defendants allege that all correspondence exchanged with Toyo Boshi clearly indicates that the product to be purchased must be 60% cashmere and 40% wool.

It was agreed that a sample shipment would be sent by Toyo Boshi to Prince by air freight. This was done in July of 1962.

A contract was entered into with Toyo Boshi on September 17, 1962. Hugo Prince testified that on the same day, after the defendants had an opportunity to have the yarn woven into fabric they sent a sample of the product to the United States Testing Company (hereafter referred to as U. S. Testing), (a recognized testing organization, as testified to by Dr. Golub, a government witness) to be tested for fiber content.

Defendants contend that the sample was returned on September 25, 1962. U. S. Testing informed the defendants that a proper test could not be conducted from the finished dyed material. A new sample was sent to U. S. Testing on the same date, accompanied by a letter from Prince stating its belief that the goods to be tested were 65% cashmere/35% wool.

On September 28, 1962, U. S. Testing reported that the sample tested was 58.4% cashmere/41.6% wool. On the basis of this test result, Prince, on October 2, 1962, established the letter of credit required for the purchase from Toyo Boshi of 20,000 pounds of material 60% cashmere/40% wool at $1.75 per pound, c. i. f.

The 20,000 pounds of yarn labelled as 60% cashmere, 40% wool was sent by Toyo Boshi to Prince in four shipments in October and November of 1962. The material was then sent out to various companies to be spun, finished and sponged.

On January 3, 1963, Hart, Shaffner and Marx ordered 30 pieces of the material woven into Prince Style No. 458/10.

On January 28, 1963, Prince sent another sample to U. S. Testing for analysis, accompanied by a letter from Prince stating its belief that the sample was 75% cashmere/25% wool. On February 6, 1963, a written report was sent to Prince stating that the sample was 55.7% cashmere (down), 1.0% cashmere (beard), 42.2% wool and 1.1% other. The defendants claim that the report was initially received on January 29, 1963 and the February 6, 1963 report merely confirmed the earlier report made by telephone.

On January 31, 1963, four (4) pieces of fabric were shipped to Hart, Shaffner and Marx. They were invoiced as

1. See 15 U.S.C. § 49.

58% cashmere/42% wool, although labeled 60% cashmere/40% wool.[2] On February 8, 1963 four more pieces were shipped to Hart, Schaffner and Marx.[3]

On January 18, 1963, the FTC, apparently unknown to the defendants, had sent a sample of Toyo Boshi yarn, secured from Customs, to an independent testing company. A report dated January 28, 1963, stated that the yard contained 84.4% wool/15.6% cashmere.

On February 7 and 13, 1963, investigators of the FTC visited Prince and informed the defendants that they suspected that the yarn purchased from Toyo Boshi was mislabelled. Defendants claim that they were informed of the alleged mislabelling for the first time on February 12, although the government alleges that such suspicions were made known on the first visit on February 7.

Upon learning of these conditions, Prince had additional samples of the material tested by various companies. The results showed that the cashmere content of the material was substantially below 60%. The results included retests by U. S. Testing of the samples which it had previously tested and had reported to have had cashmere contents close to 60%.

During February and March, 1963, the FTC had nine samples of the yarn tested and the results indicated a low cashmere content (the most favorable result indicated a cashmere content of only 36.6%).

After an agent of the FTC had visited Hart, Schaffner and Marx on February 19, 1963 to secure samples of the material shipped by Prince to Hart, Schaffner and Marx, Hart, Schaffner and Marx notified Prince that an FTC agent had been there and questioned the content of the material. Thereafter, on March 8, 1963, Prince requested Hart, Schaffner and Marx to return the eight pieces sent to them and this was done. The samples of material taken from Hart, Schaffner and Marx produced the following results: 1) 57.3% wool/42.7% cashmere; 56.5% wool/43.5% cashmere.

While this action was pending, an expert agreeable to both sides tested ten samples of the fabric and the results again showed that the cashmere content was well below 60%. As a result, the parties agreed that Prince would sell the fabric labelled as 74% wool/26% cashmere, which it did to Howard Stores, allegedly at a loss of over $35,000.

Defendants made a claim for their losses against Toyo Boshi and U. S. Testing. The claim against Toyo Boshi was settled for $10,000. The litigation against U. S. Testing is still pending.

The government charges the defendant with four violations of the 1953 cease and desist order[4] viz.: 1) importing

---

2. The product would be within the 4% tolerance if the cashmere content was accurately reflected by the invoice. In addition, Hugo Prince testified that it was through inadvertence that the percentages on the tickets of the pieces sent to Hart, Schaffner and Marx were not the same as those appearing on the invoice. Mr. Prince testified that the discrepancy was not intentional.

3. The sale to Hart, Schaffner and Marx was the only one made from the material in question prior to this action and the eight pieces mentioned were the only ones ever actually delivered out of the shipments from Toyo Boshi in accordance with the September 17, 1962 contract.

4. "It is ordered that the corporate respondents, H. M. Prince Textiles, Inc. and Devonshire Fabrics, Inc. and their offi-

cers and Hugo M. Prince * * *, individually, and respondents' representatives, agents and employees, directly or through any corporate or other device, in connection with the introduction or manufacture for introduction into commerce, or the sale, transportation or distribution in commerce, as 'commerce' is defined in the Federal Trade Commission Act and the Wool Products Labeling Act of 1939, of blankets or other wool products as such products are defined in and subject to the Wool Products Labeling Act of 1939, which products contain, purport to contain, or in any way are represented as, containing 'wool', 'reprocessed wool', or 'reused wool', as those terms are defined in said Act, do forthwith cease and desist from misbranding said products by:

1. Falsely or deceptively stamping, tagging, labeling or otherwise identifying

into the United States misbranded woolen yarn; 2) manufacture of the misbranded woolen fabrics for introduction into commerce; 3) introducing said misbranded woolen fabrics into commerce; and 4) selling, transporting and distributing said woolen fabrics in commerce. The government seeks the maximum civil penalty ($5000) for each violation [5] in addition to an injunction.

The defendants contend that the 1953 order was concerned exclusively with the use of reprocessed or reused wool in blankets and even if they mislabelled the wool prdoucts involved in this action, there would be no violation of the order. A perusal of the cease and desist order indicates that although the FTC might have been substantially concerned with blankets, it was not exclusively so concerned. The order reads blankets or other "wool products".[6] If the FTC had intended the order to relate only to blankets, there would have been no need to insert the words "or other 'wool products' ".

Even if the FTC was primarily concerned with blankets, to limit the scope of such a cease and desist order to prohibiting only those violations which have been presently found to exist would be placing an undue burden on the FTC in the discharging of its functions. The FTC is also concerned with preventing future illegal practices. The Supreme Court in F. T. C. v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081 (1952) has stated:

> Orders of the Federal Trade Commission are not intended to impose criminal punishment or exact compensatory damages for past acts, but to prevent illegal practices in the future. In carrying out this function the Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. If the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity.

See F. T. C. v. Colgate-Palmolive Co., 380 U.S. 374, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965); F. T. C. v. Henry Broch & Co., 368 U.S. 360, 82 S.Ct. 431, 7 L.Ed.2d 353 (1961); Hunter Mills Corp. v. F. T. C., 284 F.2d 70 (2d Cir. 1960), cert. denied, 366 U.S. 903, 81 S.Ct. 1045, 6 L.Ed.2d 203 (1961).

such products as to the character or amount of the constituent fibers included therein;

2. Failing to securely affix to or place on each product a stamp, tag, label or other means of identification showing in a clear and conspicuous manner:

(a) The percentage of the total fiber weight of such wool product, exclusive of ornamentation not exceeding five percentum of said total fiber weight of (1) wool, (2) reprocessed wool, (3) reused wool, (4) each fiber other than wool where said percentage by weight of such fiber is five percentum or more, and (5) the aggregate of all other fibers.

(b) The maximum percentages of the total weight of such wool product of any nonfibrous loading, filling or adulterating matter;

(c) The name or the registered identification number of the manufacturer of such wool product or of one or more persons engaged in introducing such wool product into commerce, or in the offering for sale, transportation, distribution or delivery for shipment thereof in commerce, as 'commerce' is defined in the Wool Products Act of 1939.

PROVIDED that the foregoing provisions concerning misbranded shall not be construed to prohibit acts permitted by paragraphs (a) and (b) of Section 3 of the Wool Products Labeling Act of 1939; and provided further, that nothing contained in this order shall be construed as limiting any applicable provisions of said Act, or the Rules and Regulations promulgated thereunder * * *." See 15 U.S.C. § 68a(a) & (b).

5. 15 U.S.C. § 45(*l*).

6. "The term 'wool product' means any product, or any portion of a product, which contains, purports to contain, or in any way is represented as containing wool, reprocessed wool, or reused wool." 15 U.S.C. § 68(e).

■ The FTC has broad discretion in framing the order that it believes is required under the circumstances. Courts will not interfere with such an order if it has a reasonable relation to the illegal practices that exist. In addition, courts have constantly found that is reasonable to frame an order broadly enough to prevent illegal practices in the future. F. T. C. v. Colgate-Palmolive Co., supra, 380 U.S. at 395, 85 S.Ct. 1035. There is sufficient similarity between mislabelling wool as to the content of reprocessed or reused wool and mislabelling cashmere-wool fabrics as to fiber content to justify considering the misbranding [7] in this case as violative of the 1953 cease and desist order.

■ The defendants' further claim that even if there was a mislabelling or misbranding it was not done wilfully or intentionally and therefore they should not be subject to any penalties. They indicate that the very words used in the order, viz., "falsely and deceptively" import the idea of a wilful or deliberate conduct which implies an intention to do the acts complained of.

■ However, such lack of wilfulness or intention is not a valid defense to an action by the government to recover civil penalties. All that the government need prove is that a cease and desist order has in fact been violated, which has been done in this case. United States v. Vitasafe Corp., 212 F.Supp. 397 (S.D.N.Y.1962); United States v. Karns, 1963 Trade Cases ¶ 70, 950 (S.D.N.Y. 1963); United States v. Home Diathermy Co., 1960 Trade Cases ¶ 69, 601 (S.D. N.Y.1959). The reason for this is obvious. A cease and desist order is designed to induce the defendant to rid himself of any business practices which have the capacity to violate the order. The main objective is to insure the protection of the public which must be protected whether the violations are intentional or not. See Standard Distributors

v. F. T. C., 211 F.2d 7 (2d Cir. 1954); Parke, Austin & Lipscomb, Inc. v. F. T. C., 142 F.2d 437 (2d Cir. 1944). However, the lack of intention to violate the order must be considered in determining the extent of the civil penalties to be imposed. United States v. Vitasafe Corp., supra, 212 F.Supp. at 398. The evidence presented in this case would not justify a conclusion that the acts of the defendants were intentional.

In addition the court finds that the words "falsely and deceptively", which are used in the order, merely mean incorrectly and misleadingly, without having any connotation of intentional or wilful conduct.

■ It should be noted that the defendants explicitly consented to the terms of the order and made no objection to the scope of the order nor did they appeal from such order. The order is a final one [8] and it is well settled that a defendant cannot attack a final cease and desist order in a subsequent enforcement proceeding. See F. T. C. v. Morton Salt Co., 334 U.S. 37, 54, 68 S.Ct. 822, 92 L.Ed. 1196 (1948); Parke, Austin & Lipscomb, Inc. v. F. T. C., supra, 142 F.2d at 442; United States v. Vitasafe Corp., supra, 212 F.Supp. at 398.

Further, there is no disagreement between the parties that any good faith on the defendants' part would be relevant in determining the amount of the penalties. See United States v. Vitasafe Corp., supra; United States v. Karns, supra; United States v. Home Diathermy, supra. However, the government claims that the conduct of the defendants is just about tantamount to bad faith. For example, the government's position is that the circumstances surrounding the two tests conducted by U. S. Testing are suspicious, for how else could an admittedly competent laboratory make such gross errors on two separate occasions. Further, it is the government's contention that the failure to inform Hart,

7. There is really no serious dispute as to whether the goods in question were mislabelled. The many tests conducted together with the other evidence presented

by the government clearly indicate and prove a misbranding.

8. 15 U.S.C. § 45(g).

Schaffner and Marx that the second test conducted by U. S. Testing resulted in a finding that the cashmere content was down to 56.7% and that 1.1% was neither cashmere nor wool, also indicates bad faith.

Defendant makes no attempt to explain the mistakes of the laboratory, but rather, indicates that it relied in good faith on the findings of a recognized testing organization (U. S. Testing) and in, fact, such mistakes were costly to them.

Insofar as the failure to notify Hart, Schaffner and Marx is concerned, defendants' position is that according to the U. S. Testing report the cashmere content was still within the 4% tolerance rule and anyone with business experience would realize that Hart, Schaffner and Marx would not be interested in having detailed reports on the results of each test.

The government advances the position that even if the defendants acted in good faith, they did not exercise that degree of care necessary to prevent the type of mislabelling that the cease and desist order meant to prevent. As an example of such lack of care, the government asserts that a prudent businessman would have made several sample tests from each of the four shipments received and the defendants at best made only two sample tests altogether prior to any sale by the defendants. Doctor Golub testified that it is the practice of an average merchant in New York to test only one sample, although in the Doctor's opinion, this is totally inadequate to prevent mislabelling.

Since, in spite of the Doctor's opinion as to adequacy, testing one sample is apparently the accepted custom of reliable merchants in New York, the defendant would not be lacking in the exercise of reasonable care by following an accepted business custom.

■ While the government mentions several other examples of alleged bad faith and lack of care, this court does not feel constrained to discuss each one in detail. Suffice it to say that in the light of all the evidence presented, it is the finding of this court that the defendants acted with the good faith and care dictated by the circumstances.

■ It is the determination of this court that, technically speaking, the 1953 cease and desist order was violated and civil penalties may properly be imposed. However, several factors should be considered in mitigation of such civil penalties, viz., the lack of intent on the part of the defendants, their good faith and due care, their good business record and their cooperation with the government.

■ Therefore, a penalty of $250 is imposed on the defendants for each of the four violations which the government has proved, resulting in a cumulative penalty of $1000.

■ The government seeks in addition to the civil penalties, an injunction enjoining defendants from further violations of the cease and desist order. The imposition of such an injunction is entirely within the discretion of the court. Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944). See Walling v. Brooklyn Braid Co., 152 F.2d 938, 940 (2d Cir. 1945). The fact that a defendant has ceased violating an order, either before or after the action was commenced, is no defense to the issuance of the injunction. Hecht Co. v. Bowles, supra, 321 U.S. at 327, 64 S.Ct. 587; S. E. C. v. Boren, 283 F.2d 312 (2d Cir. 1960). Nor does the government have to fulfill the traditional equity prerequisites before an injunction can be issued. Shafer v. United States, 229 F.2d 124 (4th Cir.), cert. denied, 351 U.S. 931, 76 S.Ct. 788, 100 L.Ed. 1460 (1956); Walling v. Brooklyn Braid Co., supra, 152 F.2d at 940. However, the court is still under an obligation to carefully examine all the circumstances before imposing the heavy burden of an injunction on a defendant. See Hecht Co. v. Bowles, supra, 321 U.S. at 328, 64 S.Ct. 587. Cf. R. H. Macy & Co. v. F. T. C., 326 F.2d 445 (2d Cir. 1964).

■ In a case such as this, whether or not injunctive relief should

be granted depends greatly on the dictates of public interest. Protection of the public should be a paramount consideration in determining the propriety of an injunction. See Hecht Co. v. Bowles, supra; Walling v. Brooklyn Braid Co., supra.

This court finds that the government has not shown that an injunction is required in order to protect the interests of the public. Therefore, the government's request for injunctive relief is denied.

So ordered.