**UNITED STATES of America,**
**Appellee,**

**v.**

**BEATRICE FOODS CO., Appellant.**

**No. 73–1120.**

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 15, 1973.

Decided March 8, 1974.

See also D.C., 52 F.R.D. 14.

Edward L. Foote, Chicago, Ill., for appellant.

George Edelstein, Atty., U. S. Dept. of Justice, Antitrust Div., Washington, D. C., for appellee.

Before LAY and BRIGHT, Circuit Judges, and EISELE, District Judge.*

LAY, Circuit Judge.

This is an appeal from a summary judgment granted by the District Court for the District of Minnesota, the Honorable Philip Neville presiding, in a suit brought by the United States against Beatrice Foods Company under § 11(*l*) of the Clayton Act, 15 U.S.C. § 21(*l*); and § 5(*l*) of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*). The government sought civil penalties and injunctive relief for two violations of a Federal Trade Commission consent order. The trial court granted summary judgment in favor of the United States, assessed monetary penalties and ordered divestiture of Beatrice's holdings acquired in violation of the FTC order.[1]

On appeal Beatrice contends that:

(a) Under Count I, there has been no showing that Beatrice's transactions with Maple Island Dairies violated the consent decree;

(b) The district court erred in granting summary judgment in that questions of fact exist as to the intended meaning of the consent decree;

(c) The district court erred in imposing daily penalties for the Maple Island transactions, first, because Beatrice was not given adequate notice of the alleged order violation, and second, because there was no continuing violation but only a single illegal acquisition;

(d) The district court lacked the power to grant injunctive relief requiring Beatrice to divest itself of its interest in Maple Island; and

(e) Under Count II, the court erred in requiring Beatrice to divest its minority stock interest in Valley Gold Dairies.

*Background*

In 1956, the Federal Trade Commission instituted proceedings against Beatrice and three of its competitors alleging acquisitions in violation of § 7 of the Clayton Act, 15 U.S.C. § 18, and § 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). The proceedings against Beatrice's competi-

---

* G. THOMAS EISELE, United States District Judge, Eastern District of Arkansas, sitting by designation.

1. The opinions below are reported at 344 F. Supp. 104 (summary judgment), and 351 F. Supp. 969 (penalties and decree).

tors were all settled by consent decrees.[2] In March, 1964, an FTC hearing examiner held that five of Beatrice's recent acquisitions violated § 7 of the Clayton Act. The examiner ordered divestiture of the five firms and enjoined Beatrice for ten years from acquiring "the whole or any part of the stock, share capital or assets" of any dairy firm. On April 26, 1965, the FTC affirmed the examiner's decision.

Beatrice petitioned for review of the order in the Ninth Circuit. While the petition was pending, the FTC and Beatrice agreed to settle the case with entry of a modified order. In May, 1967, the Ninth Circuit modified the FTC order to reflect the settlement and affirmed the order as modified. On June 7, 1967, the FTC issued the modified order.

The modified order required divestiture of five unlawfully acquired dairies, whether owned in whole or in part by Beatrice, to a single purchaser.[3] The order also contained the following cease and desist provision:

> Beatrice shall cease and desist, for a period of ten (10) years from the effective date of this order from acquiring, directly or indirectly, any interest in any firm, corporate or noncorporate, engaged principally or as one of its major commodity lines at the time of such acquisition in any State of the United States or in the District of Columbia in the business of manufacturing, processing or distributing at wholesale or on retail milk routes any of the products described in Paragraph I of this order, without the prior approval of the Commission.

## COUNT I: THE MAPLE ISLAND TRANSACTIONS

Count I of the government's complaint alleged that Beatrice violated the above cease and desist order by acquiring an "interest in" Maple Island Dairies. The district court so found.

Maple Island Dairies distributed dairy products in Minnesota and Wisconsin. In 1968, Maple Island decided to dispose of its unprofitable "northern division" distribution system. This division had been distributing dairy products bearing the Maple Island label (1) at four stores owned by Maple Island,[4] (2) along 11 routes operated by Maple Island employees, and (3) along 11 routes owned and operated by independent distributors.

Representatives from Maple Island met frequently with representatives of Russell Creamery of Wisconsin, Inc., a wholly-owned subsidiary of Beatrice. As a result of these discussions, the 11 routes owned by Maple Island were converted into independent distributorships. The new distributors purchased from Maple Island the assets used to operate the routes, including inventory and accounts receivable. The purchase of seven of the 11 routes was financed primarily by Beatrice. The new distributors agreed to distribute Maple Island products exclusively. They also executed conditional sales contracts, factor's liens, and notes in favor of Maple Island. Then, Beatrice, Maple Island, and each distributor signed an agreement whereby Maple Island assigned to Beatrice the conditional sales contract, factor's lien, note and franchise agreement, and the distributor accepted the assignment. On September 1, 1968, Russell Creamery

---

2. Each firm was ordered to:
   [C]ease and desist from acquiring, directly or indirectly, through subsidiaries or otherwise, the whole or any part of the stock, share capital or assets (other than products sold in the course of business) of any concern, engaged * * * in the business of manufacturing, processing or selling at wholesale or on retail milk routes [specified dairy products].

3. The modified order permitted one dairy in West Virginia to be sold separately. The original order had required divestiture of five dairy plants scattered all over the country. The consent decree, however, substituted five plants all located in the southwest.

4. The disposition of the four Maple Island stores is not involved in this case.

(Beatrice) began supplying the dairy products for all but a few of the new distributors.

The 11 independent Maple Island distributors, who owned their own physical facilities, only owed Maple Island for their 30-day trade accounts. Four paid these amounts themselves, six were financed by Beatrice and one was dropped from the arrangement. Maple Island also granted to Beatrice the right to use Maple Island's labels in the northern division for five years.

As a result of the above transactions, the government charged that Beatrice had violated the consent cease and desist order by acquiring an "interest in" Maple Island.

On appeal, Beatrice argues that the phrase used in the FTC order, "interest in," "does not apply to assets or interests *of* a dairy, but rather prohibits the acquisition of an interest *in* a dairy." In rejecting this argument, and in holding that there was no dispute of facts, Judge Neville found that the term "interest" has a consistent and commonly understood meaning in relationship to property, business and other things of value, citing the Restatement of Property § 5:

> The word 'interest' is used in this Restatement both generically to include varying aggregates of rights, privileges, powers, and immunities, and distributively to mean any one of them.

The district court then found that:

> "[I]nterest" includes, by definition, the rights transferred here to Beatrice by Maple Island. The license to use the label, the notes, distributorship agreements, sales contracts and factor's liens are all "rights in the nature of property" and valuable rights forming a part of the business and in many instances comprising assets of Maple Island. Whereas before, Maple Island held all rights, privileges, powers, and immunities relating to the assets transferred, after the transfer, Beatrice held some of those rights and

the independent distributors held the rest. And while the sales contracts, factor's liens and notes did not give Beatrice title, Beatrice clearly held a security *interest*, i.e., a right of ownership contingent upon the default of the titleholder. Such interests are no less interests within the terms of the order because contingent upon default of the debtor. Perhaps most significant, prior to the transfer, Maple Island had the "rights to the benefits" inseparable from the property transferred, *i.e.*, the sales of its milk to the customers along Maple Island's former routes. After the transfer, Beatrice had those rights at least for the minimum period of the distributorship agreements and the advantage of an established and continuing relationship with the distributors. Beatrice thereby gained access to all or most of the customers—the sales volume—who previously bought milk from Maple Island. The net result was an increase in gross sales of Russell Creamery in Superior alone of nearly $1 million, about 30%.

United States v. Beatrice Foods Co., 344 F.Supp. 104, 111–112 (D.Minn.1972).

Beatrice's argument is that the trial court was totally preoccupied with defining "interest" and failed to recognize that the real term of art within the decree is the preposition "in" as distinguished from the possible use of the word "of." Thus it is argued that the compromise decree allows the purchase of interests *of* a dairy and proscribes only the acquisition of interests *in* a dairy. We think the argument disingenuous. Neither preposition in the context of the overall decree demonstrates, a definitive, special meaning. Both "in" and "of" are, in common usage, words of function bearing similar connotations of active and possessive participation. *See* Webster's Third New International Dictionary 1139, 1565 (1967). We must give the decree its "normal meaning" rather than one party's view of its purpose.

It is urged the trial court erred in failing to admit evidence of the pre-order negotiations between the parties to ascertain "the purpose" of the decree. Similarly, it is argued that post-decree conduct is also material.[5] We reject this contention on the same grounds that the trial court did. In United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), the Supreme Court observed:

> [T]he scope of a consent decree must be discerned within its four corners, and *not by reference to what might satisfy the purposes of one of the parties to it.* (emphasis added).

*See also* Gila Valley Irrigation Dist. v. United States, 118 F.2d 507 (9th Cir. 1941); United States v. J. B. Williams Co., Inc., 354 F.Supp. 521 (S.D.N.Y.), appeal docketed, No. 73–1624 (2d Cir. 1973); 80 Harv.L.Rev. 1303, 1315 (1967).

■ Although we think the order clear, parenthetically we note that it only prohibits acquisitions made without prior Commission approval. Beatrice knew that it was under a broad cease and desist order which was designed to prevent a large multimarket company from acquiring regional dairy firms. Beatrice could easily have allayed the risk of later litigation by seeking the Commission's prior approval before entering into negotiations with Maple Island. Significantly, Beatrice did seek FTC approval for several other acquisitions during this same period of time.

*Imposition of Daily Penalties*

With regard to the Maple Island transaction, the district court fined Beatrice $200 per day from September 1, 1968 (the date Beatrice began supplying milk to the independent distributors) through October 23, 1970 (the date the government filed its complaint), for a total of $156,400.

Beatrice attacks the imposition of the above penalty on two grounds. First, it argues that it was not given adequate notice of the violation until October 23,

5. On January 25, 1968, the FTC informed National Dairy, one of Beatrice's competitors who had earlier signed a consent decree, that the acquisition of the market share of distributors or processors would violate National's order. Specifically, the FTC wrote that:

> National Dairy is hereby notified that the Commission regards the prohibition on acquisitions in said order, Part III, as including the entering into of any arrangement with another party by which National Dairy obtains the market share, in whole or in part, of such other party. Such arrangements would include any transaction by which a processor ceases selling milk under his own label and instead distributes National Dairy milk under one of National Dairy's labels. *On the other hand, ordinary requirements or supply contracts under which a processor-distributor discontinues his processing business but continues to operate as a distributor selling, under his own label, milk supplied him by National Dairy would not be regarded as coming within the order.* (emphasis added).

The FTC advised Beatrice that it would interpret the Beatrice decree in the same manner, even though the language of the two orders was slightly different. Parenthetically, we note that the Commission's interpretation of the National Dairy order was subsequently invalidated and no new clarification ensued.

Beatrice contends that the above-underlined sentence expressed the Commission's intent not to prohibit the acquisition of distributorships. It argues that this post-decree conduct by the FTC is relevant to a determination of the order's meaning. However, its authority for this point, United States v. Atlantic Refining Co., 360 U.S. 19, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959), does not appear to extend as far as Beatrice would like. There, the Court found from the language of the decree *alone* that the government's position was at best a strained construction. It then bolstered this view by reference to the government's post-decree conduct, which had been consistent with the Court's reading of the decree. Thus, it appears that the decree in *Atlantic Refining* was *unambiguous* and that the post-decree conduct was somewhat superfluous.

Furthermore, as the government notes, the FTC's letter of January 25, 1968, sets forth a far different factual hypothesis than Beatrice's arrangement whereby the rights under the distributorships carried with them the license to use Maple Island's label, its goodwill and sales volume in the northern division.

1970, the date the complaint was filed.[6] Second, Beatrice contends that daily penalties were unwarranted because the consent order prohibits only the *act of acquisition* and not continued holding of illegally acquired assets. These two contentions will be discussed separately.

## A. *Notice*

Beatrice argues that *no* penalty could be imposed before the FTC gave notice that Beatrice's conduct was in violation of the cease and desist order. Assessment of penalties for conduct occurring before such notice would, according to Beatrice, violate due process.

We look first at the statutory scheme for the imposition of penalties to determine if a notice requirement was intended by Congress.

When the FTC determines that one of its orders has been violated, the statutory procedure calls for certification of pertinent facts to the Attorney General. 15 U.S.C. § 56. If the Attorney General decides to bring suit, the penalty provisions of § 5(*l*) of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*), and § 11(*l*) of the Clayton Act, 15 U.S.C. § 21(*l*), come into play.[7] These statutes contain no notice requirement. In United States v. J. B. Williams Co., Inc., 354 F.Supp. 521 (S.D.N.Y.), appeal docketed, No. 73–1624 (2d Cir. 1973), the district court unequivocally rejected the argument that notice is statutorily required:

> The court disagrees with defendants' assertion that "it is settled that the Government may not impose penalties under 15 U.S.C. § 45(*l*) with respect to alleged violations of orders where these violations preceded Commission notice that the conduct was deemed in violation of the order." Defendants' Memorandum 58–59. *Such notice is neither required by the statutory scheme nor by the Commission's rules and procedures.* The only procedural step required by the F.T.C. Act before institution of a Section 5(*l*) suit is the certification of facts relating to the alleged violation to the Attorney General. *See* Section 16, 15 U.S.C. § 56. *A blanket rule requiring prior notice by the Commission of alleged violations of its orders has absolutely no statutory basis whatever.*

*Id.*, 354 F.Supp. at 532 (emphasis added).

The legislative history of the penalty provisions supports this conclusion. The Federal Trade Commission Act was amended in 1938 by the Wheeler-Lea Act, which provided that FTC orders would become final in 60 days or upon completion of review proceedings in the courts of appeals. Act of March 21, 1938, 52 Stat. 111. The Clayton Finali-

---

**6.** Since the trial court held that this was the *last* day for which a penalty could be imposed, acceptance of Beatrice's notice theory would mean that only one day's penalty could be assessed.

**7.** Section 5(*l*) of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*), provides:

> Any person, partnership, or corporation who violates an order of the Commission to cease and desist after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States. Each separate violation of such an order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the Commission each day of continuance

of such failure or neglect shall be deemed a separate offense.

Section 11(*l*) of the Clayton Act, 15 U.S.C. § 21(*l*), provides:

> Any person who violates any order issued by the commission or board under subsection (b) of this section after such order has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States. Each separate violation of any such order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the commission or board each day of continuance of such failure or neglect shall be deemed a separate offense.

ty Act of 1959 similarly amended the Clayton Act. Act of July 23, 1959, 73 Stat. 243. These significant changes lend considerable support to the government's position that no notice is required by the statute. Prior to 1938, the Commission had to prove *three* violations before penalties could be assessed. First, it had to prove a violation upon which to base its own cease and desist order. Second, it had to prove a violation of the order (*i. e.*, conduct occurring *after* the issuance of the order) before a court of appeals could enforce the order. Finally, it had to prove a third violation for a violator to be held in contempt of the court of appeals enforcement order. The Wheeler-Lea Amendment changed this cumbersome procedure. However, the same three steps remained in effect insofar as Clayton Act violations were concerned until 1959. The legislative history of the Clayton Finality Act, discussed in FTC v. Jantzen, Inc., 386 U.S. 228, 87 S.Ct. 998, 18 L.Ed.2d 11 (1967), makes it clear that that amendment was designed to streamline enforcement proceedings under the Clayton Act in the same manner as the Wheeler-Lea Amendment had done for the FTC Act:

"The effectiveness of the Clayton Act . . . has long been handicapped by the absence of adequate enforcement provisions. . . . S. 726 would put teeth into Clayton Act orders and would fill the enforcement void which has existed for many years.

S.Rep. No. 83, 86th Cong., 1st Sess. 2 (1959), U.S.Code Cong. & Admin.News 1959, p. 1815.

"The bill . . . is in effect a perfecting amendment to the Clayton Act. It has no other purpose than to effect the will of Congress with respect to the role of the Federal Trade Commission in Clayton Act enforcement in the same manner and to the same degree that the will of Congress was effectuated by the Wheeler-Lea amendments to the Federal Trade Commission Act."

105 Cong.Rec. 12732.

In FTC v. Henry Broch & Co., 368 U. S. 360, 82 S.Ct. 431, 7 L.Ed.2d 353 (1962), the Supreme Court discussed this legislative history and then noted:

"In contrast, the procedures that are contained in the Federal Trade Commission Act for enforcement of cease-and-desist orders issued thereunder are much simpler and more direct. A cease-and-desist order issued pursuant to section 5 of the Federal Trade Commission Act, as amended, becomes final upon the expiration of the time allowed for filing a petition for review, if no such petition is filed within that time."

*Id.* at 366 n. 6, 82 S.Ct. at 435 *quoting* H.R.Rep. No. 580, 86th Cong., 1st Sess. 4, U.S.Code Cong. & Admin.News 1959, p. 1804.

However, the Supreme Court did warn that overly broad language in an FTC order would not necessarily "withstand scrutiny under the 1959 amendments." The Court said:

The severity of possible penalties prescribed by the amendments for violations of orders which have become final underlines the necessity for fashioning orders which are, at the outset, sufficiently clear and precise to avoid raising serious questions as to their meaning and application.

*Broch, supra* at 367–368, 82 S.Ct. at 436.
*See also* Sperry Rand Corp. v. FTC, 110 U.S.App.D.C. 1, 288 F.2d 403, 404 (1961); and United States v. Standard Distributors, Inc., 267 F.Supp. 7, 9 (N. D.Ill.1967), for a similar interpretation. *Cf.* United States v. H. M. Prince Textiles, Inc., 262 F.Supp. 383, 388 (S.D.N. Y.1966).

■ We are thus satisfied that no notice is required under the statutes. However, this does not resolve the constitutional challenge to the imposition of penalties before notice of violation is given. As indicated Beatrice asserts that notice was not given until the complaint was filed. On the other hand, the government's position is that the cease and

desist order itself gives sufficient notice of what conduct is proscribed.

Beatrice relies primarily on Continental Baking Co. v. Dixon, 283 F.Supp. 285 (D.Del.1968). There, the government notified Continental that its compliance report, with regard to a cease and desist order previously entered against it, was unacceptable in that the information it contained was inadequate and incomplete. Thereafter, Continental filed a supplemental report. The FTC then notified Continental that the reports did not show compliance and added that it was unable to determine whether Continental was in violation of the order without more information.

Continental then brought suit, seeking to quash the FTC's order for a third report and requesting a preliminary stay suspending penalties until the dispute over the reports was settled. Under Continental's interpretation of the statute, 15 U.S.C. § 45(l), it would be subjected to penalties for each day that the controversy remained unresolved (if it were ultimately found in violation)—hence, the request for the stay.

The court found that the penalty issue was not ripe for review:

> If the Court were to accept Continental's view of the relevant statutory provision it would be constrained to grant the stay requested, but as the Court reads the provisions of 15 U.S. C. § 45(l) in conjunction with the rules and regulations[8] of the Federal Trade Commission, the Commission has the obligation to determine and to inform parties whether and to what extent their conduct may be in violation of a cease and desist order. It is only after the Commission has made such a finding that the penalties contemplated by 15 U.S.C. § 45(l) could be assessed, and only from that day forward. Any other interpretation of the statute and regulations would raise serious questions of due process.

In the instant case, the Commission concedes that it has made no decision as to whether plaintiff's conduct violates the cease and desist order. As this Court views the litigation at this preliminary stage, no penalties have accrued against which this Court could issue a stay, and thus, there is no justiciable controversy which would render the case ripe and proper for review.

Continental Baking Co. v. Dixon, 283 F. Supp. 285, 287–288 (D.Del.1968).

Beatrice likewise relies on the dictum of the district court found in United States v. ITT Continental Baking Co., No. C–1220 (D.Colo. Aug. 2, 1971), aff'd, 485 F.2d 16 (10th Cir. 1973). That case was also a suit by the government to recover civil penalties and injunctive relief for violations of a consent cease and desist order. Although the district court found that the transactions violated the order, it refused to impose daily penalties based on the "single acquisition" theory (discussed infra). With respect to notice, ITT Continental apparently contended that the FTC had to notify it of its intent to certify the case to the Attorney General. The district court rejected this argument; however, it added the following statement:

> Had the Court concluded that the violations were continuing in nature, a determination of the question of whether or not reasonable notice should have been given would be required. In light of the Court's finding in paragraph 7 hereof, this question need not be resolved, but, as obiter dictum, it would seem unreasonable to permit the commission to *knowingly* let daily penalties accrue without giving notice of the commission's position at the earliest reasonable time.

Slip Opinion at 5 (emphasis added).

8. As the government points out in its brief, the court never indicated what rules and regulations of the Commission it was referring to. There are no Commission regulations which require the giving of notice of a violation.

In affirming the district court, the Tenth Circuit made no mention of the notice issue, presumably because it was unnecessary in light of the court's holding that daily penalties were unwarranted.[9]

Beatrice attempts to bolster its due process argument with the following facts:

(1) On December 9, 1968, the Commission notified Beatrice by letter that it had come to the Commission's attention that Beatrice "may have acquired, directly or indirectly, an interest in Maple Island . . . ." This letter also requested Beatrice to submit all information relevant to the Maple Island transaction and "a detailed statement why, in Beatrice's opinion, the acquisitions or transactions are not subject to the Commission's order."

(2) In January, 1969, Beatrice filed its annual compliance report, in which it referred only to "agreements with independent distributors of Maple Island." This information being inadequate, the Commission, by letter dated April 29, 1969, again requested Beatrice to provide detailed information regarding the Maple Island "arrangements." It does not appear in the record that Beatrice ever replied directly to this letter.

(3) On September 12, 1969, the Commission resolved to investigate Beatrice's compliance with the order. By letter of September 12, 1969, the Commission informed Beatrice of the resolution. The letter also rejected Beatrice's 1969 compliance report "for the reason that the Commission is unable to determine from such report the manner and extent of Beatrice's compliance with [the cease and desist] order." The letter further stated that the Commission was of the opinion that the report "raises a real question as to whether the arrangements did not in fact involve fundamental questions of order coverage." Pursuant to the September 12, 1969, resolution, the Commission also ordered Beatrice and Maple Island to file special reports. These reports were filed with the Commission in November, 1969.

(4) On June 17, 1970, the Commission certified to the Attorney General the facts it felt constituted violations of the order. It does not appear from the record that Beatrice was notified of this certification. On the Commission's recommendation, the Attorney General filed suit on October 23, 1970.

In summary, none of the Commission's communications with Beatrice prior to October 23, 1970, unequivocally stated that the Commission felt Beatrice was in violation of the order.[10] At most, the Commission indicated that *possible* violations existed which warranted further investigation. Beatrice urges that this is exactly what Continental Baking Co. v. Dixon, *supra*, held to be insufficient notice.

The government does not attempt to distinguish *Dixon*, but simply asserts that the decision ignores the statutory

---

9. The only other case to consider the notice issue in the constitutional sense appears to be United States v. J. B. Williams Co., Inc., 354 F.Supp. 521 (S.D.N.Y.), appeal docketed, No. 73–1624 (2d Cir. 1973). Although the court *rejected* the constitutional argument, it appears that the case is distinguishable on its facts:

If defendants intend by this assertion to claim a violation of their right to due process in this case, the claim is rejected. *The record shows that the FTC informed defendants that the advertisements contained in their first compliance report were in violation of the order.* The Commission took the unusual step of permitting defendants to file a second compliance report. The Commission informed defendants in June, 1969, on the basis of this report, that they were still not in compliance with the order. When, after this notice and after 17 months since the order became final, defendants proceeded to disseminate the advertisements challenged here without prior approval by the Commission, defendants acted at their own peril.

*J. B. Williams, supra,* 354 F.Supp. at 532–533 (emphasis added).

10. As will be discussed, the government specifically informed Beatrice of the Valley Gold (Count II) violation.

scheme.[11] Relying on the previously discussed legislative history, the government argues that the order itself is sufficient notice of the duty it imposes.

We think the basic question necessarily turns on whether the order itself is sufficiently clear to place Beatrice on notice of the prohibited conduct. The question of proper notice, as in cases of statutory construction, depends on whether the order itself is so vague "that men of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." *Cf.* Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). This same reasoning must apply to construction of the order here involved. Our examination satisfies us that the FTC decree barring Beatrice from acquiring any "interest in" a dairy firm was in fact sufficiently precise in terminology to place Beatrice on notice of its wrongful action in its transactions with Maple Island Dairies. Additionally, one cannot completely ignore the atmosphere and official history surrounding the cease and desist order. We think it obvious, as the trial court concluded, that "the acquisition of the sales volume by Beatrice and the loss of Maple Island as a competitor is the kind of event the order was intended to prevent." Moreover, the delay and alleged uncertainty of the FTC in stating that the transactions were proscribed is attributable in large measure to Beatrice's own procrastination in giving the FTC sufficient information upon which to act. If Beatrice had simply taken the trouble to seek permission of the FTC or even to make inquiries whether FTC approval was necessary, much delay could have been avoided.

Litigation continually arises as to the meaning and breadth to be given

consent decrees in antitrust cases. *Cf.* United States v. Armour & Co., 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); United States v. Atlantic Refining Co., 360 U.S. 19, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959). Simply because a party misconstrues its lawful obligations under such decrees, it is not afforded a legal defense if in law that interpretation turns out to be erroneous. Misunderstanding of the law is no more an excuse under the Clayton Act than anywhere else. In effect, the argument proffered here is similar to the defendant's contention, urged more emphatically in the district court under Count II, that it acted in good faith. We think, as did the district court, that if this has any relevancy at all it is a factor to be considered by the trial court only in measuring or mitigating the penalty.

*B. The Offense: Single or Continuing?*

The continuing penalty provisions of 15 U.S.C. §§ 21(*l*) and 45(*l*) are virtually identical. Section 21(*l*) provides in part:

> Each separate violation of any such order shall be a separate offense, *except that in the case of a violation through continuing failure or neglect to obey a final order of the commission or board each day of continuance of such failure or neglect shall be deemed a separate offense.* (emphasis added).

Beatrice argues that here there was no *continuing* violation. Since the consent decree prohibits only "acquisitions"[12] rather than "acquisitions and further holdings," Beatrice argues that it has committed only one violation because an acquisition is an isolated occurrence which is not continuing in nature.[13] The government, on the

---

11. The government points to United States v. Ancorp National Services, Inc., 367 F.Supp. 1221 (S.D.N.Y.1971), where, in a ruling on a preliminary motion, the court characterized *Dixon* as "a misconception of the entire statutory framework."

12. The relevant portion of the decree is set out in full at p. 1262 of this opinion.

13. Beatrice concedes that an order could be drawn which would prohibit acquisitions *and further holdings*; however, it argues that the order in question was not so drawn.

other hand, argues that an acquisition is a continuing offense until it is undone.

This case is factually similar to United States v. ITT Continental Baking Co., No. C–1220 (D.Colo. Aug. 2, 1971), aff'd, 485 F.2d 16 (10th Cir. 1973), wherein the Tenth Circuit adopted the position advocated by Beatrice, i. e., that the FTC order [14] merely proscribed the *acquisition* of assets: "The acquisition itself, and not the *method* of operation thereafter, is the critical factor, and this is the event or incident to which the complaint and the order were directed." 485 F.2d at 19 (emphasis in original).

Such a limited construction of the order ignores the crucial effects of an acquisition and would render nonacquisition orders virtually meaningless.[15] As the government persuasively urges here:

> For competitive purposes there is nothing intrinsically wrong with the "act of acquisition" in and of itself. *Rather it is the effect of an acquisition, the relationship it creates which may lead to its proscription. . . .* The order's express and agreed terms barred further "acquisitions" and that term plainly had the same meaning as in Section 7 of the Clayton Act. The anti-competitive effects of acquisitions condemned by Section 7 come from the fact that, by holding the assets, the acquiring firm changes the competitive structure of the industry involved. It is the permanent effect of prohibited acquisitions which Congress sought to remedy in the statute

. . . . [Any other interpretation] *would convert all orders barring future acquisitions into minor expenses of any acquisition or merger, for the prohibition could be avoided by payment of a $5,000 penalty.* (emphasis added).

In Gottesman v. General Motors Corp., 414 F.2d 956 (2d Cir. 1969), cert. denied, 403 U.S. 911, 91 S.Ct. 2208, 29 L. Ed.2d 689 (1971), the court reasoned:

> Here the very acquisition and position of potential control which was found violative of the Clayton Act as of 1949 continued through 1961. *We need not dispute the statement of the district court that, in the ordinary antitrust case, there is no "presumption of continuance of unlawful conduct." Here, however, what was unlawful was du Pont's status as stockholder in General Motors, and that status continued until divestiture.*

*Id.* at 965 (emphasis added).

Similarly, in United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), the defendants argued that where the challenged stock acquisition occurred in 1917, the government could not bring suit in 1949 to undo the acquisition since § 7 was applicable only to the acquisition and not to the subsequent holding of the stock. The Supreme Court rejected this argument:

> We repeat, that the test of a violation of § 7 is whether, at the time of suit,

Beatrice does not cite to any nonacquisition orders drawn with what it considers the requisite specificity. The clause in the Beatrice order seems to be the standard nonacquisition language.

14. The relevant language in the ITT order is identical to that in the Beatrice decree.

15. The Tenth Circuit stated that the imposition of [single] penalties "does not insulate the *consequences* of the acquisition from further proceedings which remain available to the Government." 485 F.2d at 21 (emphasis added). Although it did not give any indication as to what these further proceedings are, there appear to be only two conceivable alternatives. First, the government could bring a contempt action for violation of the order, in which case the penalties

would be within the discretion of the court. However, since the contempt suit and the civil penalty suit are regarded as concurrent remedies (*see* United States v. Standard Distributors, Inc., 267 F.Supp. 7, 10–11 [N.D.Ill.1967]) equally available to the government, there is no reason to limit the government to the contempt action when it is seeking more than $5,000 in penalties. Second, the government could bring a separate action for divestiture (or, as it did here, seek divestiture as another remedy for the order violation). However, divestiture alone is clearly not an adequate alternative. In the present case, Beatrice has enjoyed the benefits of the illegal acquisition since September 1, 1968, and continues to do so to this date since the district court's order was stayed pending appeal.

there is a reasonable probability that the acquisition is likely to result in the condemned restraints. . . . *The fire that was kindled in 1917 continues to smolder.*

*Id.* at 607, 77 S.Ct. at 884 (emphasis added).[16]

In United States v. Schine, 260 F.2d 552 (2d Cir. 1958), cert. denied, 358 U. S. 934, 79 S.Ct. 318, 3 L.Ed.2d 306 (1959), the defendants were found to have violated an antitrust decree by acquiring interests in theaters without prior court approval. The defendants tried to argue that the statute of limitations on these acquisitions had run; however, the court held:

[A]lthough the initial acts in contempt of the decree occurred prior to the statutory period, the "illegal" conditions which they created continued up to the date of the order to show cause and resulted in what might be called "continuing contempts."

*Id.* at 555–556.

■ It is significant that Beatrice does not contest the imposition of daily penalties for the Count II (Valley Gold) failure to divest. As the government points out, the daily penalty provision was thought necessary in the case of divestiture orders because otherwise "an order dissolving an unlawful merger could be ignored after the mere payment of a $5,000 fine." H.R.Rep.No.580, 86th Cong., 1st Sess. 7, U.S.Code Cong. & Admin.News 1959, p. 1807. If each day's holding of assets subject to a divestiture order is a separate offense, we think the same should be true of each day's holding of illegally acquired interests.

16. *Gottesman* and *du Pont* each involved § 7 of the Clayton Act. Since the cease and desist order in our case is based upon the 1956 findings of the FTC that Beatrice had violated § 7, interpretations of that statute should be equally pertinent to an interpretation of the consent order.

17. It is significant to note that the *Herbold* court reversed the district court *in toto* because it found that Herbold had not violated the cease and desist order. Moreover, the government had not requested injunctive re-

*Equitable Power of District Court to Order Divestiture*

The district court's order of December 26, 1972, required Beatrice to divest itself:

absolutely and outright in good faith of all rights, titles, interests, assets and facilities including the use thereof, directly or indirectly acquired by defendant or its agents and subsidiaries in the former so-called northern division or area of Maple Island Dairy as the result of, and arising out of, its arrangements, contracts, or agreements or those of defendant's agents and subsidiaries, with Maple Island Dairy or others.

United States v. Beatrice Foods Co., 351 F.Supp. 969, 972 (D.Minn.1972).

■ Beatrice complains that the district court lacked authority to enter the above order. Beatrice relies primarily on Herbold Laboratory, Inc. v. United States, 413 F.2d 342 (9th Cir. 1969). In *Herbold*, the Ninth Circuit reasoned that "Congress, in prescribing a civil action for monetary penalties [15 U.S.C. § 45(*l*)], indicated no intent that the equitable powers of District Courts to issue injunctions might also be invoked." *Id.* at 344. The court further observed that:

When a statute so clearly provides certain, specific sanctions for violations of a Cease and Desist Order, we cannot believe that the courts should reach beyond the statutory provisions and exert a power which, apparently, the Congress has deliberately withheld.

*Id.*[17]

lief until the time of closing argument before the trial court. The Ninth Circuit discussed the injunctive power question only because it was not sure that "the District Court, had it reached the conclusion that the appellants had not violated the Order, would not have undertaken to enjoin future violations." *Herbold, supra* at 344. Thus, the reasoning of the Ninth Circuit with respect to the propriety of injunctive relief was clearly dicta. The rationale of *Herbold* has been rejected by other courts. *See* United States v. ITT Continental Baking Co., No.

Here, the district court held that 15 U.S.C. § 45(*l*), "though making no mention thereof, does not attempt to limit the exercise of the court's general equitable powers . . . ." United States v. Beatrice Foods Co., 351 F. Supp. 969, 971 (D.Minn.1972). We find ample authority for this reasoning.

In Porter v. Warner Holding Co., 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), the Price Administrator brought suit to enjoin a landlord from violating the Emergency Price Control Act and to require him to make restitution to tenants of excess rents collected. The trial court granted the injunction, but denied the restitution order because it felt there was no jurisdiction under the statute for restitution.

The Supreme Court reversed, finding that the district court's inherent equitable powers could be used to sustain a restitution order:

Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. *Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.* "The great principles of equity, securing complete justice, should

not be yielded to light inferences, or doubtful construction." Brown v. Swann, 10 Pet. 497, 503, 9 L.Ed. 508. See also Hecht Co. v. Bowles, *supra*, 321 U.S. 321, 330, 64 S.Ct. 587, 88 L. Ed. 754.

*Porter, supra* at 398, 66 S.Ct. at 1089 (emphasis added).

*See also* Wyandotte Transportation Co. v. United States, 389 U.S. 191, 200, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); Mitchell v. DeMario Jewelry, Inc., 361 U.S. 288, 291–292, 80 S.Ct. 332, 4 L.Ed. 2d 323 (1960); Culpepper v. Reynolds Metals Co., 421 F.2d 888 (5th Cir. 1970).[18]

Finally, we note that the underlying statutory basis for an FTC cease and desist order is § 7 of the Clayton Act. Apropos to our discussion is the Supreme Court's discussion of that section in United States v. E. I. du Pont de Nemours & Co., 366 U.S. 316, 328–331, 81 S.Ct. 1243, 1251–1253, 6 L.Ed.2d 318 (1961):

It cannot be gainsaid that complete divestiture is peculiarly appropriate in cases of stock acquisitions which violate § 7. That statute is specific and "narrowly directed," . . . . The very words of § 7 suggest that an undoing of the acquisition is a natural remedy. Divestiture or dissolution has traditionally been the remedy for

---

C–1220 (D.Colo. Aug. 2, 1971), aff'd, 485 F.2d 16 (10th Cir. 1973); United States v. Bostic, 336 F.Supp. 1312 (D.S.C.1971), aff'd per curiam, 473 F.2d 1388 (4th Cir. 1972), cert. denied, 411 U.S. 966, 93 S.Ct. 2146, 36 L.Ed.2d 686 (1973); United States v. Vitasafe Corp., 234 F.Supp. 710 (S.D. N.Y.1964), aff'd per curiam, 352 F.2d 62 (2d Cir. 1965).

18. As stated in Walling v. Brooklyn Braid Co., Inc., 152 F.2d 938 (2d Cir. 1945):

The action taken below was based upon the general powers of courts of equity to grant injunctions and, as in cases between private litigants, the public interest is always to be considered and protected when such a court in the exercise of its sound discretion grants or withholds injunctive relief. Central Kentucky Gas Co. v. Railroad Commission, 290 U.S. 264, 271, 54 S.Ct. 154, 78 L.Ed. 307; United States

v. Morgan, 307 U.S. 183, 194, 59 S.Ct. 795, 83 L.Ed. 1211. In a case like this it is self-evident that the public interest is directly concerned in the proper enforcement of a valid wage order. Good administration of the statute is in the public interest and that will be promoted by taking timely steps when necessary to prevent violations either when they are about to occur or prevent their continuance after they have begun. *The trial court is not bound by the strict requirements of traditional equity as developed in private litigation but in deciding whether or not to grant an injunction in this type of case should also consider whether the injunction is reasonably required as an aid in the administration of the statute, to the end that the Congressional purposes underlying its enactment shall not be thwarted.*

*Id.* at 940–941 (emphasis added).

Sherman Act violations whose heart is intercorporate combination and control, and it is reasonable to think immediately of the same remedy when § 7 of the Clayton Act, which particularizes the Sherman Act standard of illegality, is involved. Of the very few litigated § 7 cases which have been reported, most decreed divestiture as a matter of course. *Divestiture has been called the most important of antitrust remedies. It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of § 7 has been found.* (emphasis added).[19]

## COUNT II: THE VALLEY GOLD TRANSACTION

As part of the consent decree, Beatrice was ordered to divest itself of its ownership of certain plants. The relevant portion of the decree reads:

Beatrice Foods Co., ("Beatrice"), within a period not exceeding eighteen (18) months from the effective date of this order, unless extended, shall divest itself absolutely and in good faith to a purchaser approved in advance by the Commission, of all plants which are owned in whole or in part by Beatrice or operated by Beatrice at Pasadena, California (two plants); Cedar City, Utah; El Paso, Texas; Roswell, New Mexico; Albuquerque, New Mexico; all locations in the State of Arizona; and Morgantown, West Virginia, . . . as may be necessary to restore the properties as competitive entities, all as hereinafter provided.

Provided, however, that this order does not require that the plant, assets, properties and businesses located at Morgantown, West Virginia, be sold to the purchaser of the other plants,

assets, properties and businesses described above.

Provided further, however, that if, at the expiration of one year from the effective date of this order, Beatrice establishes that despite its good faith efforts it has been unable to dispose of the plants, assets, properties and businesses described above—other than those located at Morgantown, West Virginia—to a single purchaser, Beatrice may dispose of said plants, assets, properties and businesses to two or more purchasers, approved in advance by the Commission.

As used in this order the term "assets, properties and businesses conducted by Beatrice at or in conjunction with said plants" shall include all dairy distribution stations and branches regardless of where located, which are owned in whole or in part by Beatrice or operated by Beatrice and supplied by any of said plants.

In the fall of 1967, Beatrice presented for FTC approval an offer to purchase the El Paso dairy and the 18½% stock interest in Valley Gold Dairies, Albuquerque. This offer was rejected by the FTC, presumably because it did not dispose of *all* of the properties in the order to a single purchaser.

In January, 1969, Beatrice presented for FTC approval a plan to sell the four wholly-owned Beatrice properties in El Paso, Texas; Glendale, Arizona; Cedar City, Utah; and Pasadena, California, to a single purchaser. No one but the Valley Gold majority stockholder was interested in purchasing Beatrice's Valley Gold stock. However, this stockholder was *not* interested in all four of the other properties. Thus, it was impossible to sell all five to a single purchaser. Accordingly, the FTC approved the sale of the other four properties to a single

19. On November 16, 1973, § 5(*l*) of the Federal Trade Commission Act was amended, expressly empowering district courts "to grant mandatory injunctions and such other and further equitable relief as they deem appropriate . . . ." Pub.L. No. 93–153, §

408(c), U.S.Code Cong. & Admin.News 1973, p. 656. In a letter to this court, the government has urged alternatively the retroactive applicability of this amendment because of its "remedial" nature. In view of our holding, we need not pass on this question.

purchaser, knowing that the Valley Gold stock was not part of the package. Thereafter the following events ensued:

(1) On March 6, 1969 (after the expiration of the 18-month period of the order), the FTC asked Beatrice to inform the FTC of its efforts regarding compliance with the divestiture order vis-a-vis the Valley Gold stock.

(2) Beatrice initially attempted to have the Valley Gold stock deleted from the order. The FTC denied this petition. In August, 1969, Beatrice therefore requested an extension of time until August 31, 1970, in which to divest the Valley Gold stock.

(3) The FTC denied the extension request, but said no action would be taken against Beatrice if the sale were completed by November 15, 1969.

(4) On November 14, 1969, Beatrice requested an extension until February 15, 1970. The FTC denied this request on December 12, 1969, and informed Beatrice that it intended to institute enforcement proceedings.

(5) On December 30, 1969, Beatrice requested FTC approval to sell the stock to the estate of the majority stockholder. Approval was given and the sale was actually completed on January 2, 1970.

The district court entered summary judgment for the government on this count as well, assessing penalties from November 15, 1969.

Beatrice argues that the order required timely divestiture of "all *plants* which are owned in whole or in part by Beatrice or operated by Beatrice at . . . Albuquerque, New Mexico." (emphasis added). Beatrice contends that it never owned, in whole or in part, a "plant" in Albuquerque and urges that the trial court erred in equating a minority stock interest with ownership of a plant.

In its answer to the complaint, Beatrice "admits that it was required to divest itself of its interest in . . .

Valley Gold Dairies." [20] Thus, there existed no material question of fact with respect to the meaning of the order. The trial court was correct in rejecting this argument.

■ Beatrice's second contention is that the FTC's approval of the sale of the four properties to a single purchaser constituted a waiver of that portion of the order requiring divestiture of the Valley Gold stock. There is no merit to this argument. Beatrice completely ignores the proviso to the order which reads as follows:

Provided further, however, that if, at the expiration of one year from the effective date of this order, Beatrice establishes that despite its good faith efforts it has been unable to dispose of the plants, assets, properties and businesses described above—other than those located at Morgantown, West Virginia—to a single purchaser, Beatrice may dispose of said plants, assets, properties and businesses to two or more purchasers, approved in advance by the Commission.

This paragraph simply means that the FTC's approval of the sale of the four properties only relieved Beatrice of the obligation to sell all five to a single purchaser. Beatrice was still required to find a second purchaser for the Valley Gold stock.

It is totally irrelevant that in 1967 the FTC rejected a proposed sale of the El Paso plant and the Valley Gold stock to a single purchaser. The FTC was merely trying to effectuate the purpose of the order, which would have been thwarted by approval of such a sale. The rejection simply meant that Beatrice had to come up with a better package, not that it was excused from further performance.

■ Beatrice next contends that it was entitled to an additional eighteen months in which to divest the Valley Gold stock from March 6, 1969, the date

20. The trial court also examined internal Beatrice memoranda which it found unequivo-cally recognized Beatrice's obligation to divest the Valley Gold stock.

when, according to Beatrice, it first received notice that it was still obligated to divest the Valley Gold stock. We disagree. Beatrice had notice from the date of the order that it had eighteen months in which to divest all five properties. As discussed earlier, the FTC's approval of the sale of the four properties did not terminate Beatrice's obligation to sell the Valley Gold stock. The divestiture order is clearly divided into two parts: (1) a one-year period in which Beatrice was to attempt to sell all five properties to a single puchaser, and (2) an additional six months in which Beatrice could complete the divestitures by sales to separate purchasers, if need be. Thus, the old order did not become "inoperative" when the first sale was approved; rather, it simply progressed to the second stage.

 Finally, Beatrice raises a good faith defense to the Valley Gold count. It argues that it was placed in an impossible position because there was only one purchaser interested in the Valley Gold stock, and this purchaser was not interested in the other properties. And, after the approved sale of the other properties, Beatrice still had difficulty completing the Valley Gold sale because of the purchaser's refusal to pay what Beatrice considered a fair price. The trial court properly rejected the good faith argument as a complete defense.[21]

The discretionary nature of the penalties here involved is crucial. Thus, in United States v. H. M. Prince Textiles, Inc., 262 F.Supp. 383 (S.D.N.Y.1966), the court held that good faith is not a defense to an action for civil penalties under § 45(l). Accord, United States v. Vitasafe Corp., 212 F.Supp. 397 (S.D.N.Y.1962). In H. M. Prince, the court observed that the order's "main objective is to insure the protection of the public which must be protected whether the violations are intentional or not." H. M. Prince, supra 262 F.Supp. at 388. Thus, we conclude, as did the district court, that good faith is only relevant to the severity of the penalty to be assessed.

The trial court's judgment on both counts is affirmed.

---

21. The court did, however, consider defendant's claimed good faith when it assessed penalties at the rate of $200 per day, rather than the $5,000 per day requested by the government. Judge Neville observed:

The court has some sympathy as a business proposition with defendant's difficulty in finding a ready market for a minority stock interest in a closed corporation, particularly where the principal stockholder of the corporation became deceased. The court also recognizes defendant did divest itself of its other properties as required and eventually of the Valley Gold stock, though some 49 days too late and beyond the last extension of time.

United States v. Beatrice Foods Co., 351 F. Supp. 969, 971 (D.Minn.1972).